THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* LAWRENCE CLARK, Defendant-Appellant.

First District (5th Division)    No. 80-435

Opinion filed November 30, 1981.

Steven Clark, of Chicago (Karen Michaels, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Dean C. Morask, and Paula Carstensen, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE SULLIVAN delivered the opinion of the court:

After a bench trial, defendant was convicted of deviate sexual assault and two counts of armed robbery and concurrently sentenced to an extended term of 50 years. On appeal, he contends that: (1) he was not proved sane beyond a reasonable doubt; (2) the extended term sentencing statute is unconstitutionally vague; and (3) the trial court abused its discretion in imposing the sentences.

A married couple were the victims of the offenses, and the wife testified that she and her husband were awakened at about 3 a.m. by a light being turned on; that she saw a man, whom she later identified in a lineup as defendant, wearing a knee-length military coat, dark blue ski mask with red trim, and brown gloves; that he was standing at the foot of their bed holding a gun to the head of their infant son; that defendant told them to "do what I say or else;" that he gave her some rope and told her to tie her husband's hands and feet behind his back; that defendant then pointed a gun at her and told her to go into the dining room where he said "Kneel, Bitch" and pushed her down in front of him while holding a gun to her head; that defendant forced his penis into her mouth and, when he had an orgasm, ordered her to "swallow it;" that defendant took her back to the bedroom, where he tied her in the same manner as her husband; and that defendant then took their watches and other belongings.

The husband testified in substance to the same facts and, in addition, that defendant also took their wallets containing a sum of money; that the police recovered his wife's fur coat, some books and magazines, and a mixer but that his camera equipment was never found; and that as he was viewing a lineup, defendant stepped forward, threw up his hands and said, "you can stop. What's the use? I did it." The husband's testimony regarding defendant's admission was corroborated by assistant State's

Attorney David Weiner and Investigator John Battistella, both of whom witnessed the lineup.

The victims further testified that they were Ph.D. candidates at the time in question and were trained in the observation of personality disorders; that having observed defendant at close range during the incident, they concluded his behavior was normal. On cross-examination, the wife testified that as she had not previously seen defendant, she could not say whether his eyes, voice and mannerisms were any different than on other occasions. The husband admitted that he and his wife were told defendant would probably assert an insanity defense.

Since no reasonable doubt argument is made on appeal, a detailed statement of the facts will not be necessary and that evidence will be discussed only as relating to the contentions raised.

The trial court found that at the time of the offense, defendant was able to appreciate the criminality of his conduct and to conform it to the requirements of the law and that he was guilty of deviate sexual assault and armed robbery as charged.

OPINION

■■ We first consider the question of the insanity defense. Section 6—2 of the Criminal Code of 1961 (Ill. Rev. Stat. 1977, ch. 38, par. 6—2) provides:

"(a) A person is not criminally responsible for conduct if at the time of such conduct, as a result of mental disease or mental defect, he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law.

(b) The terms 'mental disease or mental defect' do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct."

The law has long expressed the deep commitment of society to avoid the injustice of convicting a person who is insane. To that end, the criminal law is made to apply only to those who can be held responsible for their conduct. (See G. Fletcher, Rethinking Criminal Law 835-36 (1978).) Thus, the insanity defense reflects the fundamental principle that a person is not criminally responsible for an involuntary act. *People v. Grant* (1978), 71 Ill. 2d 551, 377 N.E.2d 4.

■■■ The law presumes all people sane (*People v. Martin* (1980), 87 Ill. App. 3d 77, 409 N.E.2d 114), but when evidence is introduced sufficient to raise a reasonable doubt of sanity, it is incumbent upon the State to establish beyond a reasonable doubt that the accused had capacity to commit the offense at the requisite time (Ill. Rev. Stat. 1977, ch. 38, par. 3—2; *People v. Sutton* (1976), 43 Ill. App. 3d 1008, 357 N.E.2d 1209), or as otherwise expressed, that he was sane beyond a reasonable doubt (*People*

*v. Arndt* (1980), 86 Ill. App. 3d 744, 408 N.E.2d 757). As stated in *People v. Spears* (1978), 63 Ill. App. 3d 510, 516, 380 N.E.2d 423, 428:

> "[E]ither an impairment of cognition or an impairment of volitional capacity may prevent an individual from conforming his actions to the requirements of the law and therefore give rise to a defense of insanity. * * * Thus, although an accused understood the nature of his conduct and appreciated its wrongfulness, he will be excused from criminal liability if his ability to consciously refrain from the conduct was substantially impaired by a mental defect."

Furthermore, to determine whether the accused was sane at the time of the offense requires not simply that he is able to distinguish right from wrong, but rather that he is able to exercise power to choose between them. (*People v. Meeker* (1980), 86 Ill. App. 3d 162, 407 N.E.2d 1058.) Whether the State has met its burden is a question of fact (*People v. Jackson* (1976), 42 Ill. App. 3d 919, 356 N.E.2d 979), and the fact-finder's decision will not be reversed unless so improbable or unsatisfactory as to create a reasonable doubt of defendant's sanity (*People v. Carlson* (1980), 79 Ill. 2d 564, 404 N.E.2d 233) or is so palpably erroneous as to suggest its basis in passion or prejudice (*People v. Kuhn* (1979), 68 Ill. App. 3d 59, 385 N.E.2d 388). We conclude on the basis of the record presented herein that the State has met its burden of proving defendant legally responsible at the time of the incident.

Defendant's mother testified as to his family background and solitary childhood and as to his psychiatric history which dated to 1970 when he was first hospitalized while in the army. She also stated that defendant received psychiatric treatment at various times; that when she had last seen him in December of 1977, he was nervous but was not otherwise behaving unusually; and that at the time of his arrest he was not receiving treatment.

Defendant testified that as a child he was often lonely, depressed, very nervous and active; that in the army he began drinking heavily, smoking opium, using various drugs and became depressed, forgot things, felt people were against him and "started missing time"; that because he wasn't eating or sleeping and because he was becoming violent and tried to hurt people, he was hospitalized and treated by army psychiatrists in Germany; that he was honorably discharged in 1970 for medical conditions; that he had difficulty recalling the time he spent at Fitzsimmons Hospital in Denver, Colorado in 1970 or seeing his mother while there; that after next being treated at the Hines Veterans' Administration Hospital, he was released as an out-patient and was not treated for about six months but took medication; that he returned to Hines when he was "missing time" and was given medication for about a year; that in

1973 he was readmitted to Hines for the same problems and was hospitalized in 1975 and 1976 because people complained of his violence and because of his having sex with animals and children; that in June of 1977 he had bad feelings about himself but did not want to return to the hospital until after his girlfriend had her baby in January 1978; that the last thing he remembered before his arrest was being with Van Fitzpatrick and Raymond Meyers, but he could not recall where he had been after leaving them or of seeing the victims before trial; and that he spent two weeks at the Illinois State Psychiatric Institute (ISPI) but did not remember why.

Dr. Jerome Katz, a psychiatrist, testified that he interviewed defendant on February 7, 1979, and used police, army and hospital records for his diagnosis; that the records described a variety of sexual perversions, aggression, and defendant's forcing unknown women to perform sexual acts at knifepoint or gunpoint; that defendant had been diagnosed as schizophrenic in partial remission and as having pedophilia and an attraction to young girls; that defendant complained of blackouts and felt he might lose control and become violent; and that in response to a hypothetical question, Katz found that based on the seven- to eight-year medical history of the hypothetical subject, he was suffering from schizophrenia on January 17, 1978, the date of the incident, as a result of which he could not conform his conduct to the requirements of the law.

On cross-examination Katz testified that in making his initial diagnosis he had not considered a psychologist's report that defendant was malingering to avoid trial, but he would not change his opinion; that defendant was a "reactor" who responded to external authority but could not exercise internal control; that the greater the time lapse between the crime and the psychiatric examination, the more difficult it is to make an accurate diagnosis; and that at the 50 or 60 trials at which he had testified on the issue of insanity, he had always found the defendants to be legally insane.

In the State's rebuttal it was stipulated that defendant understood his rights and told Investigator Battistella that he had been drinking with two friends at the time of the incident; that when told his alibi would not stand, defendant stated he had been a psychiatric patient and had frequent "mental blackouts;" that he recalled being in a large apartment; that he turned on the light in a room where a man and woman were and made them lie on the floor; that he thought he had a gun; that the woman looked young, was naked and on her knees; that he forced a woman to suck his penis and had a sexual climax; that he walked around the apartment putting items into a shopping cart and said, "Thanks for the hospitality" as he was leaving; and that upon seeing police cars and wondering why he had the shopping cart, he dumped it, discarded his

coat and walked away. Additionally, Battistella testified that defendant appeared normal at his (defendant's) apartment and at the police station, and assistant State's Attorney Weiner testified that defendant was sane at the time of the lineup. Assistant State's Attorney Obbish testified that Katz stated defendant's "face was almost a mask and there was a great deal of lying, as I recall."

Finally, Dr. Gerson Kaplan, a psychiatrist, testified that he interviewed defendant on February 14, 1978, and after reviewing defendant's social services report and the report of a psychologist, he initially diagnosed defendant as paranoid schizophrenic in partial remission but fit to stand trial; that defendant was uncooperative and could not be interviewed on July 24, 1978, and was possibly acutely psychotic or malingering; that after being observed for 10 days at ISPI, no evidence of psychosis was found; that he interviewed defendant again on November 14, 1978, and based on defendant's medical reports from 1975, 1976 and 1977, he was diagnosed as a sociopath who sought psychiatric care when in trouble with the law and entered mental hospitals complaining of serious mental disturbances but exhibited no such symptoms while hospitalized; that defendant had been malingering for some time; that the subject of a hypothetical question had an immature personality with antisocial features and was able to appreciate the criminality of his conduct and conform it to the requirements of the law.

On cross-examination Kaplan admitted that there were no charges pending against defendant between May and October 1976 when defendant was treated for mental disturbance; that he was unaware defendant had been hospitalized and was on medication between the first and second interviews; that while his initial diagnosis of defendant was incorrect, he could not eliminate the possibility defendant was schizophrenic on February 14, 1978.

Defendant contends that because of a mental disease, schizophrenia, he was incapable of controlling his conduct at the time of the offense. In substance, he maintains that he was not proved sane beyond a reasonable doubt because four medical reports dating from 1970 to 1977 diagnosed his illness and that the trial court's determination to the contrary was against the manifest weight of the evidence.

In our view, however, the evidence established defendant's sanity beyond a reasonable doubt. Although Katz was of the opinion that the hypothetical man was suffering from schizophrenia and as a result was unable to conform his conduct to the requirements of the law, he apparently based that conclusion in part on a one-hour interview held more than one year after the incident, and in this regard he stated that the reliability of a diagnosis decreases with time. Furthermore, Katz admitted that he had not considered certain records in making the diagnosis and

that of the 50 or 60 times he had testified, he always found the defendants to be legally insane. In contrast, Kaplan concluded that the hypothetical man exhibited antisocial behavior and could appreciate the criminality of his conduct and conform it to the requirements of the law. That opinion was based on four interviews of defendant, and although he initially diagnosed defendant as schizophrenic, he changed his opinion after reviewing defendant's medical records, which in his view established a pattern of malingering in order to avoid trial. That view was supported by the report of a staff psychologist at ISPI. Kaplan further noted that defendant's complaints of mental disturbance prior to hospitalization were not borne out by symptoms during such times. Although Kaplan testified that defendant sought psychiatric care when in trouble with the law, he admitted that no charges were pending against defendant between May and October 1976 when he was being treated.

Lay testimony also was elicited from the victims to the effect that defendant appeared normal during the incident. Defendant asserts that their testimony lacked credibility because at the time his face was concealed and they were not wearing their glasses and because no basis existed for comparing his previous behavior. Against this is the fact that both were Ph.D. candidates who had had extensive training in recognizing personality disorders, and their testimony was further supported by that of Battistella and Weiner who concluded that defendant acted normally and was sane at the time of the arrest and during the lineup and questioning at police headquarters. Defendant's mother also stated that his behavior was not unusual when she saw him in December of 1977, and significantly defendant said nothing about mental illness until told his alibi would not stand. Finally, the various reports and medical records concerning defendant were admitted into evidence.

■■ ■ In deciding whether the State has proved the defendant sane beyond a reasonable doubt, the trier of fact must consider the totality of the evidence, weighing testimony and determining credibility of witnesses, both expert and lay, without being required by law to accept the opinions of psychiatrists regarding sanity. (*People v. Martin* (1980), 87 Ill. App. 3d 77, 409 N.E.2d 114.) Rather, the weight given to a psychiatrist's opinion is to be measured by the reasons and factual details supporting such conclusion (*People v. Martinez* (1980), 86 Ill. App. 3d 486, 408 N.E.2d 358), and it is within the discretion of the trier of fact to accept one expert's opinion over another on the question of insanity so as to resolve contradictions (*People v. Meeker* (1980), 86 Ill. App. 3d 162, 407 N.E.2d 1058). Furthermore, lay witnesses may express their opinions as to sanity if such is based on personal observation of the accused (*People v. Mahon* (1979), 77 Ill. App. 3d 413, 395 N.E.2d 950), including conversations with him (*People v. Banks* (1974), 17 Ill. App. 3d 746, 308 N.E.2d 261). The

trier of fact also may consider defendant's statements as well as physical evidence and other facts in evidence on the question of sanity. 86 Ill. App. 3d 162, 168, 407 N.E.2d 1058, 1063.

The record further indicates that during the commission of the offense, defendant either brought rope with him or searched for rope in the victims' apartment, which he then used to tie the victims; that he instructed the wife how to tie her husband; that upon finishing the deviate sexual assault, defendant led the wife back into the bedroom where he instructed her to lie down opposite her husband with her head to his feet and his feet to her head and tied her in the same fashion; that he asked where the jewelry was and upon being told immediately it was in a jewelry box, he took her watch and then took her husband's watch from his person, but did not take the inexpensive enamel jewelry in the jewelry box; that he ransacked the apartment apparently searching it, at one point asking where the mixer top was; and that during this time he heard the victims' infant crying and brought it water in a baby bottle.

■■ The existence of a plan or design for the perpetration of the crime is one fact having particular relevance on the question of sanity. (86 Ill. App. 3d 162, 168, 407 N.E.2d 1058, 1064; *People v. Spears* (1978), 63 Ill. App. 3d 510, 380 N.E.2d 423.) The evidence presented herein suggests a deliberate, rational approach to the offense, and it appears that defendant was capable of directing his actions in conformity with such plan, which thereby tends to dispel any reasonable doubt that at the time of the offense, defendant's mental disease or defect substantially impaired his capacity to control his conduct or conform it to the requirements of the law. Furthermore, while certain evidence was presented as to the existence of such mental disease or defect, we find nothing in the record to suggest how it deprived him of the ability to appreciate the criminality of his conduct or conform it to the requirements of the law. We believe the trial court thoroughly assessed all relevant factors. The finding of insanity was not, therefore, so improbable or unsatisfactory as to create a reasonable doubt of guilt or so palpably erroneous as to suggest a basis in passion or prejudice.

Defendant next challenges the extended term statute as unconstitutionally vague in its use of the phrase "exceptionally brutal or heinous behavior indicative of wanton cruelty." He contends that as the phrase is undefined, it fails to provide adequate guidelines by which to impose an extended sentence and results in disparate sentences for crimes of approximately equal gravity.

Section 5—5—3.2(b)(2) of the Unified Code of Corrections (Ill. Rev. Stat., 1978 Supp., ch. 38, par. 1005—5—3.2(b)(2)) provides:

"[T]he following factors may be considered by the court as reasons to impose an extended term sentence under Section

5—8—2 [par. 1005—8—2] upon any offender who was at least 17 years old on the date the crime was committed:

\* \* \*

(2) When a defendant is convicted of any felony and the court finds that the offense was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty."

■■ We note that defendant failed to preserve the constitutional challenge to the present statute either at sentencing or by post-trial motion and therefore has waived it on review. The issue of the constitutionality of a statute cannot be raised for the first time on appeal but must have been presented and ruled upon at trial, and proper exceptions to such ruling must be preserved. (*People v. Amerman* (1971), 50 Ill. 2d 196, 279 N.E.2d 353; *People v. Smith* (1981), 93 Ill. App. 3d 1133, 418 N.E.2d 172.) In any event, we find that contention to be without merit.

■■ ■ Sentencing statutes attacked on constitutional grounds are presumptively valid (*Gregg v. Georgia* (1976), 428 U.S. 153, 49 L. Ed. 2d 859, 96 S. Ct. 2909), and the nature and extent of the penalties prescribed for criminal offenses are legislative matters (*People v. Smith* (1958), 14 Ill. 2d 95, 150 N.E.2d 815), so that consideration is given to the objective sought by the legislature through the medium of the statute (*People v. Merchel* (1980), 91 Ill. App. 3d 285, 414 N.E.2d 804). A statute violates due process of law under the Federal Constitution (U.S. Const., amend. XIV) and the Illinois Constitution (Ill. Const. 1970, art. I, §2) on the grounds of vagueness "if the terms are so ill-defined that the ultimate decision as to its meaning rests on the opinions and whims of the trier of fact rather than any objective criteria or facts." (*People v. Pembrock* (1976), 62 Ill. 2d 317, 322, 342 N.E.2d 28, 30.) Stated otherwise, a criminal statute need not particularize every prohibited act but may be framed in general terms (see *People v. Witzkowski* (1972), 53 Ill. 2d 216, 290 N.E.2d 236), and as stated in *People v. Schwartz* (1976), 64 Ill. 2d 275, 280, 356 N.E.2d 8, 10, *cert. denied* (1977), 429 U.S. 1098, 51 L. Ed. 2d 545, 97 S. Ct. 1116: "When called upon to decide a vagueness question, a court will assume, absent contrary legislative intent, that the words of the statute have their ordinary and popularly understood meanings."

Decisional law is instructive on this question. In *People v. Turner* (1981), 93 Ill. App. 3d 61, 69, 416 N.E.2d 1149, 1155, the court, considering the same question as presented here, construed the term " 'heinous' " in the dictionary sense of " 'grossly wicked or reprehensible; abominable; odious, vile.' " Furthermore, in defining the word "wanton," the court in *People v. Jones* (1979), 73 Ill. App. 3d 99, 103, 391 N.E.2d 767, 769-70, quoting *Bartolucci v. Falleti* (1943), 382 Ill. 168, 174, 46 N.E.2d 980, 983, stated:

" 'Ill will is not a necessary element of a wanton act. To constitute an act wanton, the party doing the act or failing to act must be conscious of his conduct, and, though having no intent to injure, must be conscious, from his knowledge of surrounding circumstances and existing conditions, that his conduct will naturally and probably result in injury.' "

The *Jones* court also defined "cruelty" in its dictionary meaning as a " 'disposition to inflict pain or suffering or to enjoy its being inflicted.' " 73 Ill. App. 3d 99, 103, 391 N.E.2d 767, 769.

■■ It is apparent to us that the criteria of the instant statute are not so ill-defined as to depend upon the opinion or whim of the trier of fact for its meaning. Neither do we discern a legislative intent that the words of the statute be given any other than their ordinary and popular meaning. We believe the statute provides objective criteria to assist a sentencing court in assessing whether an individual's conduct poses so great a threat to society as to warrant extended incarceration. Although formulated in general terms, the language focuses attention upon the exceptionally violent aspects of certain crimes, not otherwise inherent in the prohibited conduct. Accordingly, we find no constitutional infirmity in the extended term statute on the grounds asserted.

Defendant finally contends that the sentence was improperly imposed, since through subsequent interpretation the extended term statute requires that physical injury be inflicted beyond that which constitutes the crimes and that such injury was absent here.

■■ While a reviewing court is empowered to reduce sentences (Ill. Rev. Stat. 1979, ch. 110A, par. 615(b)(4)), the imposition thereof rests within the discretion of the trial court placed as it is in a superior position to weigh the factors which bear upon the sentence, and its determination will be not altered on review absent abuse of discretion. (*People v. Cox* (1980), 82 Ill. 2d 268, 412 N.E.2d 541; *People v. Adams* (1980), 91 Ill. App. 3d 1059, 415 N.E.2d 610.) We do not think, however, that the trial court abused its discretion here.

Contrary to defendant's position, the cases upon which he relies do not in so many words create a requirement of physical injury for purposes of imposing an extended sentence. In *People v. Warfel* (1979), 67 Ill. App. 3d 620, 385 N.E.2d 175, the victim was attacked without provocation, grabbed by the throat and thrown to the ground, and her face was slapped and beaten against the sidewalk. Although she suffered cuts, bruises and hemorrhaging near the eye, the court did not hold that those or similar injuries were required by the extended term statute. In *People v. Jones* (1979), 73 Ill. App. 3d 99, 391 N.E.2d 767, defendant robbed a bar and fired four shots into the air, frightening the patrons and causing powder burns to a deputy's right hand and face and bleeding to his right

hand. In imposing an extended sentence, the court specifically noted that the possibility of injury and the mental anguish of the victims who feared for their lives, as well as the physical injuries inflicted, were factors which amounted to "wanton cruelty." Finally, in *People v. Turner* (1981), 93 Ill. App. 3d 61, 416 N.E.2d 1149, the victim was struck in the head five times, threatened repeatedly with death, and forced into three acts of sexual intercourse, two of fellatio and one of sodomy. Finding that the victim sustained physical injuries due to defendant's actions, the court did not state that such were required in order to amount to heinous and cruel behavior. Rather, the court focused upon cruelty as " 'something that causes pain or suffering' and as a 'disposition to inflict pain or suffering or to enjoy its being inflicted' " (93 Ill. App. 3d 61, 69, 416 N.E.2d 1149, 1155, quoting *People v. Jones* (1979), 73 Ill. App. 3d 99, 103, 391 N.E.2d 767, 769) and considered the threat of death, with its concomitant mental anguish, as a significant factor. Accordingly, the court held that defendant's conduct went "beyond what is necessary to show 'exceptionally brutal and heinous behavior indicative of wanton cruelty' as interpreted in *Jones*." 93 Ill. App. 3d 61, 69, 416 N.E.2d 1149, 1155.

We read these cases as permitting the courts to consider either actual physical injury, mental suffering or both in deciding whether to impose an extended sentence. Common experience teaches that the subjective pain of mental injury often exceeds that of physical injury, and the intangible scars may be as lasting. Whether the wound is to the mind or to the body, those with close emotional ties to the victim may be affected. (See *People v. Schlemm* (1980), 82 Ill. App. 3d 639, 402 N.E.2d 810, wherein the court stated that the concealment of a corpse could be done so as to inflict such suffering on the bereaved sufficient to warrant an extended sentence.) To say, therefore, that physical injury is the sole criterion that courts may consider under the extended-term statute is to ignore an obvious class of injuries and to invite unreasonable results.

■■ In light of the case law, the facts presented here justify the imposition of the extended sentence. The victims' home was invaded, and a gun was held to the head of the one-year-old son while defendant threatened to kill him if the parents failed to do as he ordered. The husband's hands and feet were tied, and his wife was then told to disrobe, thrown to the floor and forced to commit a deviate sexual act while husband and son watched, after which she was told to "swallow it." The victims were then left tied on the floor while defendant ransacked their home for 40 minutes carrying a gun, several times demanding to know where certain of their possessions were kept. Finally, as he departed with their belongings, he said "Thanks for the hospitality." At sentencing, the trial court stated:

"The nature and circumstances of this act that the Court finds

are—particularly, the gun to the baby's head, the actions of the defendant toward the husband and wife portrays a circumstance in which this Court does find the offense was accompanied by exceptional brutal or heinous behavior indicative of wanton cruelty."

We think it clear that the wife suffered physical harm and that both victims suffered mental anguish during defendant's armed invasion of their home. Such conduct was, in our view, "exceptionally brutal behavior indicative of wanton cruelty," and therefore, the trial court did not abuse its discretion in imposing sentence.

The convictions and the sentences are affirmed.

Affirmed.

LORENZ and MEJDA, JJ., concur.