THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
EARL JOHNSON (Impleaded), Defendant-Appellant.

First District (3rd Division)   No. 80—1783

Opinion filed January 18, 1984.

Steven Clark and Patricia Unsinn, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Casimir J. Bartnik, and Mark R. Fuller, Assistant State's Attorneys, of counsel), for the People.

JUSTICE WHITE delivered the opinion of the court:

Following a jury trial, defendant, Earl Johnson, was found guilty of murder, attempted murder, attempted armed robbery, and armed violence. He was sentenced to concurrent terms of imprisonment of 80 years for murder, 20 years for attempted murder, and 15 years for attempted armed robbery. On appeal, Johnson contends: (1) that evidence of a statement made by him and of an out-of-court identification should have been suppressed as the fruit of his illegal arrest; (2) that the State failed to meet its burden of proving that his statement was voluntary; (3) that he was denied a full and fair hearing on his motion to suppress identification testimony; (4) that he was deprived of a full opportunity to present evidence to the jury relevant to the question of the weight to be given to identification evidence; (5) that a closing argument comment by the prosecution was not based on any evidence; and (6) that the trial court erred in imposing an extended-term sentence for the conviction of murder.

Evidence at trial showed that at 6:30 p.m. on December 14, 1978, three men attempted to rob the K and M Food and Liquor store located at 1257 West Roosevelt Road in Chicago. Khalil Matariyeh was the owner of the store, and he and his three sons, Walid, Nabil and Suleiman (Steve), were working in the store at the time of the attempted robbery. The only prosecution witness able to identify Johnson as one of the assailants was Steve Matariyeh. Steve testified that at 6:30 p.m., three men entered the store and that Johnson was the first of the men to enter. Johnson was holding a gun in his hand, and he said, "This is a hold up." At this time, Steve was approximately two feet from Johnson. Walid was approximately six feet from Johnson, and after Johnson announced the hold-up, Walid said, "You can get hurt playing like that." Johnson then shot Walid. At the time of the shooting, Walid had nothing in his hand and he was not moving toward anything. After the shot was fired, Steve hit Johnson on the hand with a broom. Steve continued to strike Johnson with the broom, and Nabil came from the other side of a counter and grabbed Johnson. Nabil and Johnson struggled, and then Khalil came from the back of the store and grabbed Johnson. The gun fell to the floor. Earl Peterson, one of the other assailants, picked up the gun, pointed it at Steve and shot at him; however, Steve was not hit by the shot. After this, Steve saw the three assailants run from the store. The assailants had been in the store for approximately two minutes. Steve further testified that prior to December 14, 1978, he had seen Johnson in the store on approximately nine or 10 occasions over a period of one year, that on those occasions Johnson was a customer, but that on those oc-

casions he had not spoken with Johnson. In addition, Steve testified that on December 15, 1978, he viewed a lineup at a police station and that he picked out Johnson as the man who shot Walid. The testimony of Steve Matariyeh as to the events that took place at 6:30 p.m. on December 14, 1978, was largely corroborated by the testimony of Nabil and Khalil; however, neither of these prosecution witnesses identified Johnson as one of the assailants or as the man who shot Walid Matariyeh.

Dr. Lee F. Beamer, a pathologist employed as an assistant medical examiner by Cook County, testified that on December 16, 1978, he performed a post-mortem examination on the body of Walid. He observed a projectile wound to the right eye, and he removed two projectile fragments from the brain. His opinion as to cause of death was that Walid had been shot to death.

An out-of-court statement made by Johnson after his arrest on December 15, 1978, to an assistant State's Attorney was also admitted into evidence. In that statement, Johnson stated: that at approximately 6:30 p.m. on December 14, 1978, he entered a store located at 1257 West Roosevelt Road in Chicago with Earl Peterson and Reginald Burks; that Burks had a gun and that he knew Burks had a gun; that either Burks or Peterson told everybody in the store, "Don't nobody move"; that someone started moving and Burks fired two shots; that he saw Walid Matariyeh duck but did not know if he fell; and that he ran outside and eventually went home. Johnson also said in his statement that it was Peterson's idea to rob the store, and that he had a discussion with Peterson in this regard prior to the attempted robbery.

I

■ Johnson first contends that evidence of his out-of-court statement and of the out-of-court identification by Steve Matariyeh should have been suppressed as the fruit of his illegal arrest. He argues that his arrest was illegal because he was arrested in his home without a warrant. In *Payton v. New York* (1980), 445 U.S. 573, 576, 63 L. Ed. 2d 639, 644, 100 S. Ct. 1371, 1374-75, the United States Supreme Court held that "[t]he Fourth Amendment to the United States Constitution, made applicable to the States by the Fourteenth Amendment [citations], prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest." (See also *United States v. Johnson* (1982), 457 U.S. 537, 538-39, 73 L. Ed. 2d 202, 206, 102 S. Ct. 2579, 2581.) The presence of exigent circumstances will, however, justify such a warrant-

less entry into a suspect's home to arrest. *Payton v. New York* (1980), 445 U.S. 573, 590, 63 L. Ed. 2d 639, 653, 100 S. Ct. 1371, 1382.

At the hearing on Johnson's motion to quash his arrest, the only witness to testify was Chicago police officer James Branick. He testified that during the evening hours of December 14, 1978, he was investigating the attempted armed robbery and shooting that had occurred at the grocery store located at 1257 West Roosevelt Road at 6:30 p.m. on December 14. Pursuant to his investigation, he went to Illinois Research Hospital where he interviewed Steve Matariyeh, Nabil Matariyeh and Khalil Matariyeh. They advised him that three black males had attempted to rob the store, shot the victim, fought with them and ran away. They described the shooter as a black male, 19 to 23 years of age, 5 feet 5 inches to 5 feet 8 inches tall, 140 to 150 pounds, of medium complexion and with a moustache. Nabil told him that prior to the incident he had seen two of the assailants as customers of the store, and Khalil told him that he recognized one of the assailants as a previous customer of the store. Subsequently, Branick went to the police station located at 3151 West Harrison Street. At approximately midnight, he spoke with Reginald Burks, who was under arrest at the time, in an interview room at the police station. Burks stated that he, Earl Johnson, and a man known as Pearl, committed the attempted robbery, that Earl Johnson shot the victim, and that they ran away. Burks also told him that Johnson lived in the project area. Branick was not sure if Burks gave him Johnson's address or whether he obtained it from police records. Branick then checked various police records, and he found a record for a person by the name of Earl Johnson which stated that Johnson's address was 1111 West Roosevelt Road. After obtaining this information, Branick went without a warrant to 1111 West Roosevelt Road where he placed Johnson under arrest at approximately 2:15 a.m. He then transported Johnson to the police station, where Johnson made a statement and was identified in a lineup. According to Branick, Johnson was approximately 5 feet 7 inches tall and weighed approximately 145 pounds, with a small moustache and goatee. Officer Branick also testified: that he learned from the police officer who arrested Burks that Burks was arrested at 1239 South Racine Street; that 1239 South Racine is located approximately 100 yards from 1111 West Roosevelt Road and approximately 1½ blocks from the store at 1257 West Roosevelt Road, and that 1111 West Roosevelt Road is also located approximately 1½ blocks from the store.

Although no other witnesses testified at the hearing on the motion to quash arrest, other evidence relevant to the question of the

presence of exigent circumstances was introduced both at the hearing on Johnson's motion to suppress his confession and at trial. (See *People v. Braden* (1966), 34 Ill. 2d 516, 520, 216 N.E.2d 808.) At the hearing on the motion to suppress confession, in which the circuit court addressed the issue of whether Johnson's statement was voluntary, Johnson testified that he was arrested after midnight by four police officers at a housing project located at 1111 West Roosevelt Road. According to Johnson, four police officers entered his residence while he was sleeping, went into his bedroom and told him he was under arrest. The officers did not kick the door to the residence down; rather, somebody in the home had opened the door for the officers. His mother and two of his sisters were home that night. The officers did not strike him, and he was allowed to dress before he was driven to the police station. At trial, Officer Branick testified that he arrested Johnson at 1111 West Roosevelt Road, a CHA project building, that Johnson was in his apartment, and that Johnson did not resist arrest.

Chicago police officer Daniel Kmety testified at trial that on December 14, 1978, at 11 p.m., he entered an apartment in a CHA apartment building located at 1239 South Racine Street, where he arrested Reginald Burks. Kmety recovered an unloaded .22-caliber revolver from under the mattress in Burks' bedroom. Later, at the police station Kmety talked to Officer Branick concerning Burks. Chicago police officer Joseph Celovsky, a firearm's examiner, testified at trial that on December 18, 1978, he examined the revolver and the contents of a coroner's bullet envelope, a fired .22-caliber bullet and a metal fragment. Celovsky testified that he was unable to determine whether or not the bullet had been fired from the revolver.

The guiding principle in determining whether exigent circumstances exist is reasonableness, and each case must be decided on the basis of the facts known to the arresting officers at the time they acted. (*People v. Yates* (1983), 98 Ill. 2d 502, 515; *People v. Abney* (1980), 81 Ill. 2d 159, 173, 407 N.E.2d 543.) In *Abney*, our supreme court identified three exigent circumstances: (1) the need for prompt action; (2) the absence of any deliberate or unjustified delay by the officers during which time a warrant could have been obtained; and (3) the belief that the suspect was armed and exhibited some sign of a violent character. (81 Ill. 2d 159, 169-71; see also *People v. Eichelberger* (1982), 91 Ill. 2d 359, 367, 438 N.E.2d 140, *cert. denied* (1982), 459 U.S. 1019, 74 L. Ed. 2d 514, 103 S. Ct. 383.) In the same opinion, the court also identified additional factors which suggest that officers had acted reasonably: (1) the officers were acting on a clear

showing of probable cause based on reasonably trustworthy information; (2) the defendant was clearly identified as the assailant; (3) there was strong reason to believe that the defendant was in the premises entered; and (4) the entry was peaceful. (*People v. Abney* (1980), 81 Ill. 2d 159, 171-72; see also *People v. Eichelberger* (1982), 91 Ill. 2d 359, 367-68.) Still other factors considered useful in judging the exigency of a particular situation are that: (1) a grave offense is involved, particularly a crime of violence; (2) there is a likelihood the suspect will escape if not swiftly apprehended; and (3) the arrest was made at a reasonable hour of the day. (*People v. Yates* (1983), 98 Ill. 2d 502, 515.) According to our supreme court, the aforementioned factors "should be utilized only as guidelines, not as cardinal maxims to be rigidly applied in each case." (*People v. Yates* (1983), 98 Ill. 2d 502, 515-16.) Thus, in *Yates*, the court indicated that "exigent circumstances may well exist where there is only a serious crime coupled with a reasonable possibility of imminent danger to life, serious damage to property, destruction of evidence, or the likelihood of flight." (*People v. Yates* (1983), 98 Ill. 2d 502, 516.) In other words, the factors mentioned above must only be satisfied on balance and may not be present in every case. *People v. Cobb* (1983), 97 Ill. 2d 465, 484, 455 N.E.2d 31.

In our opinion, the events that occurred on the evening of December 14 and during the early morning hours of December 15 justified the police in making a warrantless, in-home arrest. The police were investigating a shooting that had occurred in the course of an attempted armed robbery, and in our opinion, there was a clear showing of probable cause to believe that Johnson was one of the assailants. Burks told Officer Branick that he and Johnson were two of the three men who committed the attempted armed robbery, that Johnson shot the victim, that they fled, and that Johnson lived in the project area. This information from Burks bore *indicia* of reliability since Burks implicated himself in the offense and since it was corroborated by other information known to Officer Branick at the time of the arrest. Steve, Nabil and Khalil Matariyeh had advised Branick that three men had attempted to rob the store, shot the victim and ran away. The address which Officer Branick obtained from police records for Johnson was located only 1½ blocks from the store, and this corroborated Nabil's statement to Branick that he had previously seen two of the assailants as customers of the store. This last information also strengthened the arresting officers' belief that Johnson was in the premises entered. In any event, it would be reasonable to look for a man at his home after midnight. Johnson may also have had incentive

to flee. Since the police had arrested Burks in an apartment located only 100 yards from Johnson's home, the possibility existed that Johnson would be alerted to the fact that Burks had been arrested and would attempt to escape. (*People v. Cobb* (1983), 97 Ill. 2d 465, 486.) All of these facts suggested the need for prompt action.

Johnson argues that exigent circumstances are not present here, in part, because the arresting officers had no reasonable belief that he was armed. In our opinion, Burks' statement to Officer Branick that Johnson had participated in a violent crime and was the shooter certainly gave the arresting officers reason to believe that Johnson had a violent disposition and might be armed.

The evidence shows that there was no deliberate or unjustified delay by the arresting officers during which time a warrant could have been obtained. Johnson's arrest occurred at approximately 2:15 a.m. on December 15, 1978, or approximately seven hours and 45 minutes after the commission of the offense. Probable cause to arrest Johnson, however, did not arise until approximately midnight when Burks made his statement to Officer Branick. Officer Branick then obtained an address at a housing project for an Earl Johnson. The law is clear that "[e]xigent circumstances may arise *** not only immediately after the perpetration of the crime, but also when additional facts justify immediate action." (*People v. Cobb* (1983), 97 Ill. 2d 465, 486.) The record indicates that Officer Branick acted promptly once probable cause developed for Johnson's arrest and the police ascertained his whereabouts. Officer Branick testified that after he obtained information from Burks and ascertained an address for an Earl Johnson, he went to that address, where he arrested Johnson.

Furthermore, the evidence in the court below supports a conclusion that the entry into Johnson's apartment was peaceful. Johnson testified at the hearing on the motion to suppress his confession that the arresting officers did not kick down the door to his apartment, that a family member opened the door to the apartment, that the arresting officers did not strike him, and that he was permitted to dress. The fact that the arrest occurred at approximately 2:15 a.m. is offset by the presence of other factors demonstrating the existence of exigent circumstances.

"[A] trial court's determination on a motion to suppress will not be overturned unless it is manifestly erroneous." (*People v. Winters* (1983), 97 Ill. 2d 151, 158, 454 N.E.2d 299.) In our opinion, the totality of the circumstances in this case demonstrated the reasonableness of Johnson's arrest, and we will not disturb the trial court's decision denying Johnson's motion to quash his arrest.

## II

■ Johnson next raises several alleged errors which occurred at the hearing on his motion to suppress his confession, at the hearing on his motion to suppress a lineup identification and at trial. None of these issues, however, were specified in Johnson's written motion for a new trial (see Ill. Rev. Stat. 1979, ch. 38, par. 116—1(c)), and the general rule followed by Illinois reviewing courts is that "the failure by the defendant to raise an issue in the written motion for a new trial constitutes a waiver of that issue and it cannot be urged as a ground for reversal on review." (*People v. Pickett* (1973), 54 Ill. 2d 280, 282, 296 N.E.2d 856.) Supreme Court Rule 615(a) (87 Ill. 2d R. 615(a)), however, provides an exception to the waiver rule in cases where there has been "plain error." We examine the alleged errors raised by Johnson to determine whether they rise to the level of plain error.

### A

First, Johnson contends that the trial court erred in denying his motion to suppress confession because the State failed to meet its burden of proving that his statement was voluntary. His argument is that the prosecution failed to produce all material witnesses connected with the taking of his statement or explain their absence. (See *People v. Armstrong* (1972), 51 Ill. 2d 471, 475-76, 282 N.E.2d 712.) In his motion to suppress confession, Johnson alleged that any statement or confession elicited from him was the direct result of either physical or mental coercion, and by an amendment to this motion, he alleged, in part, that he had requested to make a phone call before questioning[1] and that police officers had told him that if he made a statement things would go easy for him.

At the hearing on this motion, the State produced three witnesses: Chicago police officers James Branick and Thomas Shine and Assistant State's Attorney Leonard Wojtecki. Officer Branick testified that after he arrested Johnson, he had a conversation with Johnson in an interview room at a police station at approximately 2:30 or 3 a.m., on December 15, 1978, that Johnson remained in the interview room until 4:20 a.m. when he was taken to the lockup, and that he saw Johnson at 8:30 p.m. that day when Johnson was placed in a lineup. Branick further testified that he was not aware of any other officers

---

[1]The amendment to the motion does not state whether any such requests were denied.

who spoke to Johnson during the time he was in the interview room prior to being placed in the lockup, and that between 2:30 a.m. and 4:20 a.m., Johnson never asked him if he could make a telephone call and neither Branick nor anyone in his presence made promises of leniency to Johnson in exchange for a statement by Johnson. At the lineup, Branick only told Johnson that he could pick his spot in the lineup. Officer Shine and Assistant State's Attorney Wojtecki testified that they had two conversations with Johnson on December 15, 1978. The first conversation occurred at approximately 10 p.m. and lasted approximately 10 minutes. The second conversation occurred at approximately 11 p.m. and was recorded by a court reporter. Shine and Wojtecki testified that during these conversations Johnson never asked if he could use a telephone and, Shine testified that neither of them made any promises of leniency to Johnson. Johnson testified on his own behalf as to what occurred at the police station prior to the time he made his statement. According to Johnson, he made several requests for permission to make a telephone call; however, he could not identify the persons to whom the requests were made. Johnson also testified that a police officer told him that if he made a statement, the police would try to fix it so that the State would go easy on him; however, Johnson did not remember the name of the person who said this to him or the time that this alleged promise was made. It is clear from Johnson's own testimony that this alleged promise did not occur while Johnson was in the lockup. Johnson testified that four or five officers were present when the alleged promise was made but that only two officers interrogated him in the lockup.

Johnson never objected in the trial court to the failure of the prosecution to produce any other witnesses.[2] Pursuant to Illinois statute, "[o]bjection to the failure of the State to call all material witnesses on the issue of whether the confession was voluntary must be made in the trial court." (Ill. Rev. Stat. 1979, ch. 38, par. 114—11(d).) If the defendant does not raise the objection in the trial court, the matter is waived for purposes of appeal. (*People v. Lumpp* (1983), 113 Ill. App. 3d 694, 696, 447 N.E.2d 963.) We observe, however, that defense counsel, in making an argument to the trial court on the motion, did argue that Johnson's testimony at the hearing concerning promises of leniency made to him was uncontradicted because the

---

[2]Johnson did object to the prosecution's failure to call Wojtecki after the trial court had heard testimony from the two police officers. Subsequently, Wojtecki was called as a witness. Johnson made no further objections to the prosecution's failure to call any material witnesses.

prosecution witnesses could only testify to those periods of time during which Johnson was in their immediate presence. This statement by defense counsel, at best, raises the issue of failure to produce material witnesses only vaguely, and we conclude that this issue has been waived for purposes of appellate review, especially since Johnson was unable to identify the officers who allegedly refused his requests for phone calls or who made promises of leniency to him and since any objection that was made to the failure of the State to produce material witnesses was not specified in the written motion for a new trial. In our opinion, the failure of the prosecution to produce additional witnesses to establish the voluntariness of Johnson's statement did not rise to the level of plain error.

## B

Secondly, Johnson contends that he was denied a full and fair hearing on his motion to suppress the identification testimony of Steve Matariyeh. In his motion Johnson alleged that the lineup in this case was impermissibly suggestive, and prayed that evidence of an out-of-court identification by Steve Matariyeh and that any in-court identification testimony by Steve Matariyeh be suppressed. After a hearing, the motion was denied.

Two witnesses testified at the hearing: Officer Branick and Steve Matariyeh. Johnson's argument is that the trial court erred by improperly restricting the defense counsel's examination of these two witnesses. Officer Branick testified on direct examination by defense counsel that on December 15, 1978, he conducted a lineup and that Johnson was one of the six participants in the lineup. Prior to entering the room in which the lineup was conducted, Branick advised Johnson that he could pick any spot in the lineup. Branick further testified that prior to the lineup, he only told Steve Matariyeh not to say anything until after the lineup was over; that he had no conversation with Steve Matariyeh during the lineup; and that Steve Matariyeh identified Johnson "directly" after the completion of the lineup which lasted for approximately three minutes. During the course of direct examination, the trial court sustained three objections to questions by defense counsel concerning conversations between Officer Branick and Steve Matariyeh. The relevant segment of the direct examination follows:

"DEFENSE COUNSEL: Do you recall the conversation that occurred between the two of you [after the lineup was over]?
ASSISTANT STATE'S ATTORNEY: Objection.

THE COURT: Sustained.

DEFENSE COUNSEL: What exactly did Mr. Matariyeh say?

ASSISTANT STATE'S ATTORNEY: Objection.

THE COURT: Sustained.

DEFENSE COUNSEL: What, if anything, did you say to him at that time?

ASSISTANT STATE'S ATTORNEY: Objection.

THE COURT: Sustained.

DEFENSE COUNSEL: May I have the basis Judge?

THE COURT: The question as to whether or not a violation of a defendant's constitutional rights relative to a lineup relates to the suggestivity, if there be any relative to the lineup itself, and the procedures that are used during the course of the lineup, and does not relate to what was said after the lineup.

DEFENSE COUNSEL: Was there any conversation between yourself and Steve Matariyeh during the time the lineup was being conducted?

WITNESS: No, sir.

ASSISTANT STATE'S ATTORNEY: Objection.

THE COURT: Question and answer may stand."

Defense counsel then proceeded to ask questions in other areas relating to the issue of suggestiveness. Later, during direct examination the following question was asked and answered:

"DEFENSE COUNSEL: How long after the lineup was concluded did Steve Matariyeh identify Mr. Johnson?

WITNESS: Directly after the lineup."

According to Johnson, the trial court's rulings on the prosecution's objections prevented defense counsel from inquiring of Officer Branick about any conversations between Officer Branick and Steve Matariyeh which may have occurred after the lineup but prior to the out-of-court identification by Steve Matariyeh. In our opinion, any restriction of the direct examination of Officer Branick caused by the trial court's actions in sustaining the objections did not constitute plain error. First, defense counsel never asked Officer Branick whether he had a conversation with Steve Matariyeh after the lineup but prior to Steve Matariyeh's out-of-court identification of Johnson. Secondly, defense counsel never made an offer of proof concerning any such conversation. Thirdly, Officer Branick testified that Steve Matariyeh identified Johnson "directly after the lineup," suggesting that no such conversation took place. Lastly, Steve Matariyeh testified at the hearing that no police officer spoke to him about any of the

participants in the lineup immediately after the lineup. All of these factors militate against a finding of plain error.

■ Johnson also contends that the trial court erred in restricting defense counsel's examination of Steve Matariyeh. Steve Matariyeh testified that he viewed a lineup at the police station and that he identified one person from the lineup. Johnson first complains that he was unable to elicit evidence of descriptions that Steve Matariyeh had given of his assailants. The relevant segment of direct examination follows:

"DEFENSE COUNSEL: Did you ever give any police officer any description of any person involved in this?

WITNESS: Yes.

ASSISTANT STATE'S ATTORNEY: Objection.

THE COURT: The question and answer, I will rule stand.

DEFENSE COUNSEL: Do you recall when and where you gave those descriptions?

ASSISTANT STATE'S ATTORNEY: Objection.

THE COURT: The objection will be sustained.

DEFENSE COUNSEL: Did you ever describe any of the assailants as wearing a long black coat?

ASSISTANT STATE'S ATTORNEY: Objection.

THE COURT: He may answer.

WITNESS: No.

DEFENSE COUNSEL: Did you ever describe any of the assailants wearing a black hat, dark hat?

ASSISTANT STATE'S ATTORNEY: Objection.

THE COURT: You may answer.

WITNESS: I don't remember what color it was.

DEFENSE COUNSEL: Do you remember what kind it was?

WITNESS: No."

Only one objection by the prosecution during this examination of the witness was sustained. In our opinion, the action of the trial court in sustaining that objection did not amount to plain error, because defense counsel subsequently was able to ask questions concerning descriptions that Steve Matariyeh had given to the police.

■ Johnson also complains that during his direct examination of Steve Matariyeh the trial court's rulings on objections prevented his counsel from questioning Steve Matariyeh about conversations that he may have had with police officers prior to the lineup. The relevant segment of direct examination follows:

"DEFENSE COUNSEL: Where was the first time you

[spoke to any policeman about the case]?

ASSISTANT STATE'S ATTORNEY: Objection.

THE COURT: Sustained.

DEFENSE COUNSEL: Did you have such a conversation immediately preceding the lineup?

ASSISTANT STATE'S ATTORNEY: Objection.

THE COURT: The objection will be sustained. The question is now phrased.

DEFENSE COUNSEL: Immediately prior to the beginning of the lineup, just before the lineup began, did you talk to any police officer about the incident?

ASSISTANT STATE'S ATTORNEY: Objection.

THE COURT: Sustained.

DEFENSE COUNSEL: Did you have any conversation with the police officer about the incident immediately prior to the incident?

ASSISTANT STATE'S ATTORNEY: Objection.

THE COURT: Sustained.

DEFENSE COUNSEL: May I have the basis?

THE COURT: The issue is whether or not it is unconstitutional. Although there is some latitude afforded, the matters adduced should relate to the line conducted.

DEFENSE COUNSEL: Your Honor, I would think, if I may be heard, that the procedures of the investigating officer immediately prior to conducting the lineup would for purposes of this motion be part of the lineup.

THE COURT: The Court will say that certain questions are allowed. The questions as phrased are objectionable, and the Court has sustained the objections.

DEFENSE COUNSEL: *** Within the 15 minute period preceding the beginning of the lineup, did any police officer have any conversation with you concerning those people who were going to participate in the lineup?

WITNESS: What do you mean by that?

DEFENSE COUNSEL: Did any police officer talk to you about the people who were going to participate in that lineup?

WITNESS: No.

DEFENSE COUNSEL: Was there anything said to you by any police officer about any of the people who were going to participate in the lineup?

WITNESS: No.

ASSISTANT STATE'S ATTORNEY: Objection.

THE COURT: Question and answer may stand.

DEFENSE COUNSEL: Did any police officer talk to you about any of the people who participated in the lineup immediately following the conclusion of the lineup?

WITNESS: No."

Defense counsel then proceeded to examine Steve Matariyeh in other areas concerning his ability to identify Johnson. In our opinion the action of the trial court in sustaining objections by the prosecution was not plain error. Although the trial court sustained objections to general questions concerning whether Steve Matariyeh had conversations with police officers about the "incident," it permitted defense counsel to inquire about conversations that Steve Matariyeh may have had with police officers about persons who participated in the lineup. Furthermore, it appears from our reading of the record that the trial court did not restrict defense counsel's direct examination to conversations relevant to the issue of suggestiveness that occurred within the 15-minute period prior to the lineup. Rather, it appears that defense counsel chose only to examine Steve Matariyeh as to such conversations within that 15-minute period. We cannot say that plain error occurred here.

We agree with Johnson that "a defendant has a right to a fair and impartial hearing to determine whether his identification [as the offender] was based solely on the [witness'] observation of the [assailant] at the time of the crime or whether it was improperly influenced either by actions of the investigative officers or other extraneous factors that may have unduly affected the judgment and conclusion of the witness." (*People v. Robinson* (1970), 46 Ill. 2d 229, 231-32, 263 N.E.2d 57.) Unlike *Robinson*, we do not believe that Johnson was deprived of his right to a fair and impartial hearing on his motion to suppress identification testimony.

### C

■ Thirdly, Johnson contends that he was deprived of a full opportunity to present evidence to the jury relevant to the issue of the weight to be given the identification testimony of Steve Matariyeh. At trial, during the cross-examination of Steve Matariyeh, by defense counsel, the trial court sustained objections by the prosecution to questions concerning whether Steve Matariyeh had an opinion or agreed that the person who shot his brother Walid had a "common appearing" or "unusual" face and whether he had ever seen a face similar to Johnson's face or similar to the face of the person who shot his

brother. Steve Matariyeh did testify, however, over an objection by the prosecution, that there was nothing "peculiar" about the face of the man who shot his brother. He also testified that he did not notice any scars on the face of this person, and that nothing in particular about this person's face drew his attention to it. In our opinion, this testimony sufficiently cured any error that may have occurred when the trial court sustained the objections made by the prosecution. In any event, we cannot say that any error that occurred rose to the level of plain error.

■■ Johnson also contends that his cross-examination of Nabil Matariyeh was unduly restricted because the trial court sustained an objection by the prosecution to the question, "You were able to see him while you were fighting with him, weren't you?" Nabil Matariyeh did not identify Johnson at trial, and Johnson argues on appeal that if defense counsel at trial had been able to establish the extent to which Nabil had had a face-to-face confrontation with the shooter, defense counsel may have been able to demonstrate that Nabil's opportunity to observe the offender was equal to Steve Matariyeh's opportunity to observe him. Such testimony, Johnson contends, would have weakened Steve Matariyeh's identification testimony. In our opinion, this argument is very speculative, and we do not believe that any error in this regard rose to the level of plain error.

### D

■■ Fourthly, Johnson contends that he was deprived of due process of law by a closing argument comment made by the prosecution that he alleges was not based on any evidence at trial.

During closing argument, defense counsel had argued that Johnson's out-of-court statement was untrustworthy, because Johnson had been "ripped from his home" at "some ungodly hour in the night" and "locked up for at least eighteen hours in a police station" before making the statement. During rebuttal closing argument, the prosecution responded to this comment by arguing that the taking of Johnson's statement had been delayed until a lineup had been conducted. Johnson argues that this comment by the prosecution was improper because there was no evidence at trial "that Johnson's statement was delayed or necessarily had to be delayed until an identification was made." According to Johnson, the prosecution's comment "unfairly deprecated the effect the prolonged detention of Johnson may have had on the voluntariness of his statements."

Testimony at trial by Officer Branick established that Johnson had been arrested at approximately 2:15 a.m. on December 15, 1978, and

that the lineup occurred at approximately 8:30 p.m. on that date. Assistant State's Attorney Wojtecki testified that he first spoke to Johnson in an interview room at the police station at 9:50 p.m. on that date and that Johnson made the statement which was recorded by a court reporter at approximately 11 p.m. that night.

Although we would agree with Johnson that his statement did not necessarily have to be delayed until an identification was made, we observe that the identification of Johnson at the lineup may have been an inducement for him to confess. In any event, we do not believe that the comment by the prosecution was a material factor in his conviction, and accordingly, it did not constitute reversible error.


### III

■ Lastly, Johnson contends that the trial court erred in imposing an extended term of imprisonment of 80 years for the conviction of murder.

Section 5—8—2(a) of the Unified Code of Corrections (Ill. Rev. Stat. 1979, ch. 38, par. 1005—8—2(a)) provides:

> "A judge shall not sentence an offender to a term of imprisonment in excess of the maximum sentence authorized by Section 5—8—1 for the class of the most serious offense of which the offender was convicted unless the factors in aggravation set forth in paragraph (b) of Section 5—5—3.2 were found to be present."

The second factor in aggravation set forth in paragraph (b) of section 5—5—3.2 (Ill. Rev. Stat. 1979, ch. 38, par. 1005—5—3.2(b)(2)) is: "When a defendant is convicted of any felony and the court finds that the offense was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty." In imposing an extended-term sentence for murder in this case, the trial court stated:

> "The Court, however, does find that the crime was committed in a manner that is indicative of wanton cruelty. The crime was exceptionally brutal and heinous. The Court is mindful that the victim had no signal that he might be killed by virtue of the comment he made. He may have thought that it was a game. What caused the defendant to pull the trigger as he did is something the Court cannot account for and that is what bothers this Court substantially. That is what makes the offense especially cruel. The offense qualifies for the sentence of an extended term and the Court considers it to be necessary to do so in this case in order to serve the ends of justice and protect

this society."[3]

Johnson argues that the trial judge's explanation for the imposition of an extended-term sentence could not justify the imposition of such a sentence. His argument is succinctly stated in his reply brief:

"[W]here the sentencing judge focuses on the fact that a murder is irrational and unjustified to justify imposition of the extended term sentence, he has construed the phrase 'exceptionally brutal and heinous behavior indicative of wanton cruelty' in such a manner as to qualify every murder for an extended term because every murder necessarily includes those elements. It is this construction of the statute which appellant has argued renders the statute unconstitutionally vague ***."

We agree with Johnson that a construction of the extended-term statute which qualified every murder for the imposition of an extended-term sentence would be improper. "[S]ection 5—8—2 of the Unified Code of Corrections was not intended to convert every offense into an extraordinary offense subject to an extended-term sentence." *People v. Evans* (1981), 87 Ill. 2d 77, 88-89, 429 N.E.2d 520.

The Illinois Supreme Court has held that the phrase "exceptionally brutal or heinous behavior indicative of wanton cruelty" contained in section 5—8—1 of the Unified Code of Corrections (Ill. Rev. Stat. 1979, ch. 38, par. 1005—8—1) is not unconstitutionally vague. (*People v. La Pointe* (1981), 88 Ill. 2d 482, 500, 431 N.E.2d 344.) The court stated: "Coupled with the objectives sought to be achieved and the evil the statute seeks to remedy [the descriptive adjectives employed in section 5—8—1(a)(1)] give sufficient direction to trial judges who must determine when and whether to impose the natural life sentence of imprisonment." (88 Ill. 2d 482, 500, 431 N.E.2d 344.) Furthermore, our supreme court rejected an argument by the defendant that the statutory language permitting the imposition of a natural life imprisonment sentence where conduct is "accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty" autho-

---

[3]It is unclear from the record whether the jury found Johnson guilty of the murder on an accountability theory or whether it found that he actually killed Walid Matariyeh. We observe, however, that in determining whether the death sentence was appropriate in this case, the trial judge found that the evidence at trial established beyond a reasonable doubt that Walid Matariyeh was actually killed by Johnson. The arguments on appeal concerning the propriety of the extended-term sentence for murder assume that Johnson was the actual killer, and we accept this assumption for purposes of this argument. Neither party argues whether an extended-term sentence can be imposed on a defendant convicted of a felony on an accountability theory, where the only basis for the imposition of such a sentence is a finding of exceptionally brutal or heinous behavior indicative of wanton cruelty.

rizes that sentence only if he had inflicted "torture or unnecessary pain upon his victim." The court stated:

> " 'Heinous' is defined by Webster's Third New International Dictionary (unabridged) as 'hatefully or shockingly evil: grossly bad: enormously and flagrantly criminal'; 'brutal' includes 'grossly ruthless,' 'devoid of mercy or compassion: cruel and cold-blooded.' Clearly, in our opinion, the statute does not limit the imposition of a sentence of natural life imprisonment to only those murders involving torture or the infliction of unnecessary pain." 88 Ill. 2d 482, 501.

Similarly, the appellate court has held that the phrase "exceptionally brutal or heinous behavior indicative of wanton cruelty" contained in section 5—5—3.2(b)(2) of the Unified Code of Corrections is not unconstitutionally vague. (*People v. Clark* (1981), 102 Ill. App. 3d 414, 424, 429 N.E.2d 1255.) In *Clark*, the court stated: "[T]he criteria of the instant statute are not so ill-defined as to depend upon the opinion or whim of the trier of fact for its [*sic*] meaning." 102 Ill. App. 3d 414, 424.

The imposition of a sentence, including an extended-term sentence, is a matter of judicial discretion, and absent an abuse of discretion, the sentence of the trial court may not be altered upon review. (*People v. Clark* (1981), 102 Ill. App. 3d 414, 424.) Given the definitions that our supreme court has adopted for the words "heinous" and "brutal," we cannot conclude that the trial court abused its discretion by imposing an extended-term sentence of imprisonment of 80 years for the murder of Walid Matariyeh. From our review of the record, the trial judge imposed the extended-term sentence because of the specific facts of this case, and not merely because he thought the murder was "irrational and unjustified."

For the aforementioned reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

RIZZI, P.J., and McGILLICUDDY, J., concur.