THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RICKIE JONES, Defendant-Appellant.

First District (3rd Division) No. 85—3056

Opinion filed September 16, 1987.—Rehearing denied November 3, 1987.

Stanley L. Hill and Thomas B. Stitely, both of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Thomas V. Gainer, Jr., and Theodore F. Burtzos, Assistant State's Attorneys, of counsel), for the People.

JUSTICE FREEMAN delivered the opinion of the court:

After trial in the circuit court of Cook County, a jury convicted defendant Rickie Jones of intimidation (Ill. Rev. Stat. 1983, ch. 38, par. 12—6(a)(1)) and theft (Ill. Rev. Stat. 1983, ch. 38, par. 16—1(c)(1)). The trial court sentenced him to an extended term of 10 years in the Illinois Department of Corrections.

On appeal, defendant contends the trial court erred in: (1) allowing testimony of a homicide unrelated to the charges against him and admitting into evidence a photograph of the homicide victim; (2) allowing testimony of his alleged gang membership and prior narcotics use; (3) allowing testimony of an unrelated arrest for aggravated battery and of two bonds posted on his behalf; (4) allowing the State to argue that he failed to prove his innocence and was required to meet the State's evidence; (5) imposing an extended-term sentence.

Allan Chung testified for the State that he bought the First Chinese Foods carryout restaurant on October 1, 1983, after having worked there for one month under the previous owner, Mr. Ma. Chung's parents and Adona Cheng worked with him in the restaurant. Defendant came to the restaurant in the first week of October 1983, told Chung that he belonged to the Black Gangster Disciple Nation (BGDN), demanded $30 a week plus a daily free meal, threatened to shoot him, burn the restaurant down and hurt his family if he didn't comply, and displayed a gun. Defendant also told Chung that Felton Peck was the leader of the BGDN and that Peck was taking the money from Ma before Chung bought the restaurant. Ma had spoken to Chung about Peck and Chung had met him before October 1st. Peck had been shot to death on September 28 just outside the restaurant. Defendant also told Chung he would pick the money up every Wednesday. Chung complied with defendant's demands the first Wednesday in October because he feared harm to his family or his business. Defendant gave Chung a sign to place on the wall in the employee section of the restaurant, which was divided from the public section by a plexiglass window at which the customers placed their orders. In such a position, the sign could be seen by anyone placing an order. The sign read: "No sitting, drinking unless buying food" and had the initials "B.G.D.N." at the bottom. Although defendant told Chung those were his initials, he later learned they stood for "Black Gangster Disciple Nation."

On March 27, 1984, defendant's girlfriend or wife came to the restaurant and conversed with Chung. Thereafter, Chung posted a $100 bond for the defendant because he was scared that, if he did not do so, defendant would harm him or his family or burn down the restau-

rant when he got out. Defendant told Chung he would deduct the $100 from the weekly payments at a rate of $25 and would take only $5 a week for the next four weeks. In mid-April, defendant demanded $150 from Chung to pay his lawyer and he agreed to deduct $25 per week from the next six weekly payments. Chung identified a piece of paper which Adona Cheng had written to keep track of the $250 in deductions from the weekly payments. Chung then paid defendant $30 per week until September 1984. On September 19, 1984, defendant's girlfriend/wife came to the restaurant and demanded that Chung post a $2,500 bond for defendant, which he refused to do. The next day, defendant came to the restaurant, asked for the sign, tore it up, threw it in the garbage and told Chung, "From now on no more protection for you *** I'm gonna burn your place down *** I'm going to shoot you down ***. You watch." Defendant took the torn sign from the garbage and left. Chung called the police an hour later and subsequently put the restaurant up for sale. He testified he had paid defendant about $1,500 and had given him about $1,000 worth of food. He specifically denied having hired defendant to work in the restaurant in any capacity. On cross-examination, Chung admitted that although the police would come by the restaurant to chase away unruly individuals, he never told them about defendant's extortion and they never saw the sign defendant had given him.

Adona Cheng testified that defendant ordered food every day but never paid for it, that he did not work in the restaurant, and that she saw him with a gun several times. She would pay him the $30 on Wednesdays when Chung was busy, and she believed that if they did not pay defendant he would burn the restaurant down and shoot them. She corroborated that Chung gave defendant $250 for bond and his lawyer that he deducted from the $30 weekly payments and that defendant's girlfriend/wife demanded that Chung post a $2,500 bond for defendant in September 1984. Finally, she corroborated that defendant came to the restaurant the next day, told her to take the sign with the initials "B.G.D.N." down and threatened to burn the restaurant down and kill her. On cross-examination, she stated she did not tell the police defendant was threatening and extorting money from them because the police could not protect her 24 hours a day.

Chicago police officer Albin Reyes testified that he responded to a call regarding the shooting of Felton Peck on September 28, 1983, near Chung's restaurant. He recalled seeing defendant in the restaurant several times in 1984 and responding to a call from the restaurant on September 20, 1984. On that date, Chung told him and his partner that he had been paying defendant $30 a week and had also

paid him bond and attorney's expenses. Officer Reyes identified the piece of paper on which Cheng kept track of the deductions for those expenses.

Chicago police officer Robert Norise testified he had been assigned to the Gang Crimes South unit for five years and was familiar with the BGDN. He stated that the gang is most heavily concentrated on the south and west sides of the city and has 200 to 300 members in the area of the restaurant. He also stated its symbols include pitchforks, a heart with wings and a pitchfork in it, and the initials "B.G.D.N." He identified a photograph of Felton Peck's arm as depicting a person's arm with crossed pitchforks and the initials "B.G.D.N." on it, which indicated the person's membership in the BGDN. He also stated that he had known defendant for 20 years and that defendant had told him about 15 years before that he was a member of the BGDN. Finally, he stated that he arrested defendant for aggravated battery on September 18, 1984.

Steven Chan testified that he worked as a bond writer in Division 5 of the Cook County Department of Corrections for the Cook County circuit court clerk's office. He identified a $2,500 bond slip which he made out on September 20, 1984, for defendant and a $100 bond slip for defendant made out on March 28, 1984, at the Seventh District Police Station. Dr. Tae An, an assistant medical examiner, identified the photograph of Felton Peck's left forearm as taken during an autopsy of Peck's body and as showing a tattoo on the arm.

For the defense, defendant's mother testified that he lived with her in 1983 and 1984, that he worked for Allan Chung at the restaurant, that Chung and Cheng would call defendant in the early morning to go to work but she did not know whether he had regular hours there, that she bonded defendant out of jail on September 20, 1984, and that he stayed home that entire evening. Moses Dillworth testified that he had known defendant about two years, that defendant used to work at Chung's restaurant and would occasionally take his order when he bought food for his father. He stated he did not know whether defendant was a member of the BGDN. Ricky Mitchum testified that when he frequented Chung's restaurant in 1983 and 1984 defendant would take his order. Mitchum denied he was a personal friend of defendant's and stated he did not know whether he was a member of the BGDN.

Defendant testified he began working for Chung in the last week of September 1983 as a bouncer and occasional order taker for $30 per week and a free meal. He would go to work whenever they would call him from the restaurant and tell him they were having trouble

with customers. He admitted borrowing money from Chung "[a] lot of times"; and specifically admitted borrowing $100 around March 1984, which he paid back by receiving only $5 for four weeks, and $150 approximately 10 days later. He also admitted going to the restaurant in September 1984 to ask Chung why he had not posted a $2,500 bond for him and also having "cussed at him and called him names." Defendant denied having pulled a gun on anyone at that time, ever having threatened Chung or Cheng, belonging to the BGDN or telling Officer Norise that he belonged to it. He also denied having seen or placed a sign with any initials on it in the restaurant. He claimed that neither Allan Chung nor Adona Cheng ever told the police he was extorting money from them although they came to the restaurant many times to remove unruly customers.

I

■■ ■ Preliminarily, we address the State's contention that defendant has waived most of the errors alleged by failing to include them in his motion for a new trial or to object to them at trial. Anticipating this argument, defendant urges us to reverse his convictions under the plain error rule. It is well established that to preserve error for review a defendant must object to it at trial and raise it with specificity in a post-trial motion for a new trial. (*People v. Smith* (1985), 139 Ill. App. 3d 21, 27, 486 N.E.2d 1347.) However, under Supreme Court Rule 615(a), we may notice "[p]lain errors or defects affecting substantial rights *** although they were not brought to the attention of the trial court." (87 Ill. 2d R. 615(a).) This rule is not a general saving clause preserving for review all errors affecting substantial rights whether or not they were brought to the attention of the trial court; rather, before plain error can be used to circumvent the general rule of waiver, "it must be plainly apparent from the record that an error affecting substantial rights was committed." (*People v. Precup* (1978), 73 Ill. 2d 7, 17, 382 N.E.2d 227.) In other words, the rule is applicable where the evidence is closely balanced or where error is of such magnitude that defendant was denied a fair and impartial trial. *People v. Gacy* (1984), 103 Ill. 2d 1, 28, 468 N.E.2d 1171, *cert. denied* (1985), 470 U.S. 1037, 84 L. Ed. 2d 799, 105 S. Ct. 1410.

■■ The evidence in this case was not so closely balanced that it is plainly apparent from the record that the errors waived affected any substantial rights of the defendant. We note the positive testimony of Allan Chung and Adona Cheng as to the acts of defendant constituting the offenses of which he was charged. Moreover, we note the inherent improbability of defendant's evidence, including that, for $30

per week and a daily free meal, he was willing to respond to calls at all hours of the day and night to remove unruly individuals from the restaurant and even to get into fistfights and shoving matches with them. Moreover, we note the inherent improbability of an employee who is paid only $30 per week expecting his employer to post a $2,500 bond for him. In concluding that the evidence in this case was not closely balanced, we note that a jury need not accept a defendant's exculpatory testimony but " 'may properly consider the surrounding circumstances and the probability or improbability of defendant's story' " and that a defendant must " 'tell a reasonable story or be judged by its improbabilities.' " *People v. Ortiz* (1976), 44 Ill. App. 3d 124, 128, 357 N.E.2d 1270, quoting *People v. Heflin* (1976), 40 Ill. App. 3d 635, 644, 351 N.E.2d 594.

Additionally, the alleged errors were not of such magnitude that they denied defendant a fair trial. Specifically, the evidence of Felton Peck's murder, the photograph of his arm showing a gang tattoo and the evidence of defendant's gang membership were all relevant to an understanding of the circumstances of this case. Moreover, as defendant introduced the evidence of his past drug use, he cannot now complain of its introduction and the State's cross-examination of him with respect to it. Finally, we believe that the evidence as to the two bonds posted for defendant was properly admitted as corroborative of Chung's and Cheng's testimony and that the error in the introduction of evidence of defendant's arrest for aggravated battery was sufficiently cured by a limiting instruction to the jury.

■ Defendant contends that evidence of Peck's murder was irrelevant as it did not prove any fact in issue. He contends, alternatively, that its prejudicial effect substantially outweighed whatever probative value it had. He contends the photograph of Peck's arm tended to implicate him in Peck's murder and thereby served only to prejudice him.

Evidence is relevant which tends to prove or disprove a disputed fact, makes a point in issue more or less probable or explains a fact in evidence; and the initial determination of relevancy is within the sound discretion of the trial court and will not be reversed absent an abuse of that discretion. (*People v. Hunter* (1984), 124 Ill. App. 3d 516, 533-34, 464 N.E.2d 659.) Evidence of Peck's murder helped explain the circumstances under which defendant came to the restaurant shortly thereafter and the reason he could demand money from Chung in exchange for protection. The photograph of Peck's arm, showing a tattoo worn by BGDN members, was probative of Chung's testimony that defendant told him he and Peck were members of the

BGDN. The evidence of Peck's murder and the photograph of his arm, bearing a gang tattoo, were therefore relevant.

■■ Moreover, the trial court instructed the jury that it should not take the photograph "as meaning in any way that the [d]efendant had anything to do with that *** murder" and that "[i]n fact, someone other than [defendant] has indeed been tried and convicted of that offense *** so that photograph *** should not be considered in any way by you as some evidence of some type of crime other than what the defendant is on trial for here." This limiting instruction sufficiently protected defendant against any prejudice. *Cf. People v. Krone* (1981), 98 Ill. App. 3d 619, 624, 424 N.E.2d 917 (since trial court appropriately limited purpose of testimony, it was not error to admit it into evidence).

■■ Finally, the admission of a photograph of a murder victim is within the sound discretion of the trial court, it is admissible where it is probative of some material fact despite its gruesome nature and it must be excluded when it serves only to inflame and prejudice the jury. (*People v. Christen* (1980), 82 Ill. App. 3d 192, 197, 402 N.E.2d 373.) Therefore, because the photograph of Peck's arm, with the initials "B.G.D.N." on it, was probative of his and defendant's membership in the BGDN, it need not have been excluded.

We conclude that it is not plainly apparent from the record that admission of the evidence of Peck's murder and the photograph of his arm denied defendant a fair trial. As such, they did not constitute plain error warranting a reversal of his conviction.

■■ ■ Defendant next contends his alleged gang membership was unrelated to any issue in this case because he was not charged with a gang-related offense. As such, he argues, the State's introduction of evidence of that alleged fact was highly prejudicial. He also contends the State's introduction of that evidence forced him to show that the marks on his arms were related to his past use of narcotics and were not gang tattoos. He concludes this testimony constituted error because the State made it necessary. He further argues that the State's cross-examination with regard to his drug use prejudiced him because it did not show the relevancy of this testimony, although it claimed it would do so when he objected to that line of questioning.

It is well established that evidence of gang membership is admissible if there is sufficient proof that it is related to the crime charged, *e.g.,* to show a common design or purpose, and that it need not be excluded merely because it may tend to prejudice the defendant where it is otherwise relevant and admissible. (*People v. Hairston* (1970), 46 Ill. 2d 348, 372, 263 N.E.2d 840, *cert. denied* (1971), 402 U.S. 972, 29

L. Ed. 2d 136, 91 S. Ct. 1658.) Such evidence has been allowed as relevant and probative to show the circumstances surrounding the shooting of a police officer in the Gang Intelligence unit whose activities focused on the gang to which the defendant belonged. *People v. McMurray* (1972), 6 Ill. App. 3d 129, 285 N.E.2d 242, *cert. denied* (1973), 411 U.S. 918, 36 L. Ed. 2d 310, 93 S. Ct. 1554.

■ Here, evidence of defendant's gang membership was relevant to and probative of the circumstances surrounding the charges against him. That evidence explained why he approached Chung soon after the death of Peck, who defendant himself alleged also belonged to the BGDN. It also helped to explain why Chung did not report defendant's intimidation and extortion immediately but paid him for one year before doing so. Moreover, it explained the meaning and the relevance of the initials on the sign defendant gave Chung to display in the restaurant. Finally, when coupled with Officer Norise's testimony as to the concentration of members of the BGDN in the area of the restaurant, it explained defendant's ability to "protect" the restaurant and to control its customers. In short, defendant's gang membership was intimately and inextricably related to the charges against him and was thus properly admitted at trial.

■ Prior to the defendant's direct testimony of the nature of the marks on his arms and his prior drug use, the State had not introduced or sought to introduce any evidence that he had gang insignia tattooed on his body, specifically his arms, as did Felton Peck. As such, it is untenable for defendant to maintain that he was "forced" to introduce evidence of his prior drug use to dispel improper inferences created by the State. Rather, we believe defendant voluntarily chose to introduce this evidence. A defendant who procures, invites or acquiesces in the admission of evidence, even though improper, cannot complain. (*People v. Payne* (1983), 98 Ill. 2d 45, 50, 456 N.E.2d 44, *cert. denied* (1984), 465 U.S. 1036, 79 L. Ed. 2d 708, 104 S. Ct. 1310.) Neither do we believe that the State's failure to show the relevancy of its cross-examination of defendant with respect to his past drug use denied him a fair trial. As defendant volunteered this information, he assumed the risk that it would be elaborated by cross-examination or comment in closing argument and cannot now complain (*People v. Briggman* (1974), 21 Ill. App. 3d 747, 753-54, 316 N.E.2d 121) because the State attempted to do so.

We conclude that it is not plainly apparent from the record that the evidence of defendant's alleged gang membership, his introduction of evidence of his past drug use or the State's cross-examination with respect to that drug use denied him a fair trial. As such, they did not

constitute plain error.

▉ Defendant next contends Officer Norise's testimony that he arrested defendant for aggravated battery on September 18, 1984, prejudiced him because that arrest was unrelated to the charges against him. He contends he was similarly prejudiced by Steven Chan's testimony as to the bail bonds paid on his behalf. He asserts the prejudicial effect of these facts outweighed their probative value and that the State failed to show that this evidence was relevant and reasonably necessary to its case.

"Other crimes" evidence, generally inadmissible if relevant only to show a propensity to commit crime, is admissible if relevant for any other purpose. (*People v. Simpson* (1984), 129 Ill. App. 3d 822, 835, 473 N.E.2d 350.) Moreover, the relevance of such evidence to a material issue and whether its probative value outweighs its prejudicial effect are matters within the sound discretion of the trial court and will not be reversed absent a clear abuse of that discretion. *People v. Fuller* (1983), 117 Ill. App. 3d 1026, 1036, 454 N.E.2d 334.

▉ The evidence of the bonds posted for defendant did not tend to show a mere propensity to commit crime. Rather, it was probative of Chung's testimony that he was asked twice to post bond for defendant and did so the first time in the amount of $100. It also tended to prove the truth of his testimony that defendant came to the restaurant after he refused to post the second bond, angrily tore the sign he had given Chung and threatened harm to him and the restaurant. Moreover, its probativeness was not substantially outweighed by any prejudice to defendant to the extent that it constituted "other crimes" evidence. Chan did not testify at all to the underlying charges. As such, and given the relevancy of this evidence, the trial court did not abuse its discretion in allowing this testimony.

▉ Officer Norise's testimony as to defendant's arrest for aggravated battery in September 1984, on the other hand, was improper "other crimes" evidence. The State did not have to introduce evidence of the substantive charge on which defendant was arrested in September 1984 to corroborate Chung's testimony that he was asked but refused to post bond for the defendant at that time. This testimony was not relevant for any valid purpose. Rather, it served only to show a propensity to commit crime and thus to prejudice defendant. However, the error in admitting this testimony was harmless. Defendant established on cross-examination of Officer Norise that this arrest was not connected to the charges on which defendant was being tried. More importantly, the trial court cured the error when it sustained defendant's objection to a repetition of the testimony on re-

direct, specifically instructed the jury that it should disregard that testimony and generally instructed it that it should disregard all stricken testimony. *People v. Winfield* (1983), 113 Ill. App. 3d 818, 839, 447 N.E.2d 1029.

We therefore conclude that it is not plainly apparent from the record that the introduction of Chan's testimony of the two bonds paid on defendant's behalf denied defendant a fair trial and thus constituted plain error warranting a reversal of his convictions. We also conclude that the trial court cured any error in Officer Norise's direct testimony that he arrested defendant for aggravated battery and thus we need not recognize it as plain error.

## II

■■■ Next, defendant contends that, in closing argument, the State shifted the burden of proof to him and destroyed the presumption of innocence. Specifically, he complains of the prosecutor's argument to the jury that "defendant had to, based on the facts and the evidence against him, *** make certain admissions to you [a]nd you may and must take those admissions into consideration." Defendant contends this argument amounted to a statement that he had to testify in order to prove his innocence. He cites *People v. Weinstein* (1966), 35 Ill. 2d 467, 220 N.E.2d 432, in support.

Defendant has misconstrued the plain meaning and intent of the words "had to" as used by the prosecutor, which is clear when they are read in context. The prosecutor did not mean that the defendant "was required to" make admissions to the jury in the sense of a legal duty or obligation. Rather, he meant defendant "felt obligated to" do so in view of the evidence against him. This is made clear beyond peradventure by the phrase "based on the facts and evidence against him" in the complained-of argument. Moreover, the meaning and intent of this argument is made abundantly clear by the prosecutor's subsequent exposition of the "admissions" which the defendant, in fact, made. This argument cannot reasonably be construed as shifting the burden of proof to defendant or as destroying the presumption of innocence and we decline the invitation to so construe it.

*Weinstein* does not compel a contrary conclusion. Therein, the State repeatedly argued to the jury, in the face of sustained objections, that the defendant had the burden of creating a reasonable doubt of guilt. In all, defendant made and the trial court sustained 17 objections to the State's argument. The court held that this argument destroyed the presumption of innocence and imposed a heavier burden upon the defendant than the law required. (35 Ill. 2d 467, 470, 220

N.E.2d 432.) The argument in *Weinstein* was fundamentally more egregious and manifestly prejudicial than the argument at issue here. Finally, we cannot say that, had this argument not been made, the jury might have reached a different result. (*People v. Franklin* (1976), 42 Ill. App. 3d 408, 355 N.E.2d 634.) As the evidence was sufficient to prove defendant guilty beyond a reasonable doubt, he was not prejudiced by this argument.

## III

Defendant lastly contends the trial court abused its discretion in sentencing him to an extended term of 10 years. He notes that intimidation and theft are Class 3 felonies under sections 12—6(b) and 16—1(e)(3) of the Criminal Code of 1961 and that five years is the maximum sentence for such offenses under section 5—8—1(a)(6) of the Unified Code of Corrections. (Ill. Rev. Stat. 1983, ch. 38, pars. 12—6(b), 16—1(e)(3), 1005—8—1(a)(6).) He also asserts the trial court did not comply with sections 5—4—1(c) and 5—8—1(b) of the Unified Code of Corrections, which require a trial court to specify on the record the particular evidence, information, aggravating or mitigating factors, or other reasons relied upon in imposing sentence for a felony conviction. (Ill. Rev. Stat. 1983, ch. 38, pars. 1005—4—1(c), 1005—8—1(b).) He further asserts the trial court did not consider sentencing alternatives and his background in sentencing him and thus acted arbitrarily. In support, he cites the trial court's comments at the sentencing hearing that, *inter alia,* he was "totally disgusting" to the court.

Defendant also contends the trial court's finding of exceptionally heinous behavior indicative of wanton cruelty, on which it based the extended sentence, required a physical act of abuse, which he did not commit. He further argues an extended term is permitted only for the most serious class of offenses of which a defendant is convicted (*People v. Guyon* (1983), 117 Ill. App. 3d 522, 453 N.E.2d 849), and only where he previously has been convicted of a felony of the same or a greater class than the one on which such sentence is imposed (*People v. Warfel* (1979), 67 Ill. App. 3d 620, 385 N.E.2d 175), neither of which is the case here. From *Guyon* and *Warfel,* defendant concludes he improperly received an extended sentence because these were his first serious felony convictions and he had not previously been convicted of any greater class felony. Finally, he argues the extended-term sentence was improper because such sentences are legislatively intended to punish only recidivists.

The trial court did not abuse its discretion in imposing an extended sentence. Specifically, the court did state its reasons for impos-

ing sentence on defendant, including that, during the course of his threats, he terrorized the victims with a gun and "mentally abused them in a horrible and heinous fashion, threatening to kill them, threatening to burn down their business and threatening to kill their families." Moreover, the record reflects that the court did consider defendant's background and sentencing alternatives but decided that probation or conditional discharge "would deprecate the seriousness of [defendant's] conduct and would be inconsistent with the ends of justice" and that imprisonment was necessary "for the protection of the public."

 Moreover, the trial court did not violate the statutory guidelines for imposing an extended sentence. Section 5—8—2 of the Unified Code of Corrections provides that a judge may sentence an offender to a prison term in excess of the statutory maximum "for the class of the most serious offense of which he was convicted" if the aggravating factors set forth in section 5—5—3.2(b) were present. (Ill. Rev. Stat. 1983, ch. 38, par. 1005—8—2.) Where they are present, the judge may sentence an offender to a maximum term of 10 years for a Class 3 felony. (Ill. Rev. Stat. 1983, ch. 38, par. 1005—8—2.) Sections 5—5—3.2(b)(1) through (b)(4) list the factors which a trial court may consider as reasons to impose an extended-term sentence under section 5—8—2. (Ill. Rev. Stat. 1983, ch. 38, par. 1005—5—3.2(b)(1) through (b)(4).) Section 5—5—3.2(b)(1) allows a trial court to impose an extended sentence "[w]hen a defendant is convicted of any felony after having been previously convicted in Illinois of the same or greater class of felony, within 10 years." (Ill. Rev. Stat. 1983, ch. 38, par. 1005—5—3.2(b)(1).) However, the trial court sentenced defendant under section 5—5—3.2(b)(2), which allows a trial court to impose an extended sentence "[w]hen a defendant is convicted of any felony and the court finds that [it] was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty." (Ill. Rev. Stat. 1983, ch. 38, par. 1005—5—3.2(b)(2).) Thus, section 5—5—3.2(b)(1) is but one avenue by which a trial court may impose an extended sentence. As such, its requirements cannot be read into section 5—8—2 to generally limit the application of that section. That is, section 5—8—2 cannot be construed as allowing an extended sentence where and only where a defendant has been previously convicted of a felony of the same or a greater class. Such a construction would render the other provisions of section 5—5—3.2(b) superfluous. Statutes are construed to give effect to all of their provisions and to avoid strained readings which render parts of them superfluous. (*People v. Wilson* (1985), 132 Ill. App. 3d 652, 653-54, 478 N.E.2d 37.) *Warfel* does not compel a

contrary conclusion since defendant cites the language quoted therein from section 5—5—3.2(b)(1). *People v. Warfel* (1979), 67 Ill. App. 3d 620, 625, 385 N.E.2d 175.

 Moreover, the "class of the most serious offense of which he was convicted" language in section 5—8—2 cannot be construed to mean that the offense for which an extended sentence is imposed must be the most serious offense of which a defendant was ever or would ever be convicted. So construed, no court could impose an extended sentence since it could not know whether the offender would ever be convicted of a greater offense. This construction is patently absurd. In construing a statute, it also must be presumed that the legislature did not intend absurdity, inconvenience or injustice. (*People v. Carlyle* (1985), 130 Ill. App. 3d 205, 211, 474 N.E.2d 9.) Rather, this language can logically be interpreted to mean that a court can impose an extended sentence for the most serious offense of which a defendant is convicted when he is convicted of more than one felony at the same time. See *People v. Guyon* (1983), 117 Ill. App. 3d 522, 538, 453 N.E.2d 849 (where defendant was convicted of rape and armed robbery, Class X felonies, extended sentence for concurrent conviction of aggravated kidnapping, a Class 1 felony, vacated).

Defendant's argument that the extended-term statute is intended to punish recidivists is similarly not persuasive. The cases he cites in support contain broad statements that "[t]he purpose of section 5—5—3.2(b) is to discourage recidivism" (*People v. Richardson* (1984), 104 Ill. 2d 8, 18, 407 N.E.2d 1024) and that "the purpose behind the extended term statute is to increase the punishment of defendants who have exhibited recidivism" (*People v. Baker* (1983), 114 Ill. App. 3d 803, 810, 448 N.E.2d 631). However, we believe the fact that these cases involve the construction of section 5—5—3.2(b)(1) reveals the proper limitation of this language. That is, only section 5—5—3.2(b)(1), not section 5—5—3.2(b)(2), is intended to punish, and is therefore limited to, recidivist defendants. That this conclusion is correct is revealed by two other cases which, while containing similarly broad statements, also involved the construction only of section 5—5—3.2(b)(1): *People v. Hobbs* (1981), 86 Ill. 2d 242, 427 N.E.2d 558, and *People v. Robinson* (1982), 89 Ill. 2d 469, 433 N.E.2d 674.

 Finally, *People v. Clark* (1981), 102 Ill. App. 3d 414, 429 N.E.2d 1255, conclusively establishes that an act of physical abuse or violence is not required to impose an extended sentence for heinous behavior indicative of wanton cruelty. Therein, the court stated after reviewing pertinent case law:

"We read these cases as permitting the courts to consider ei-

704

*ther actual physical injury, mental suffering or both* in deciding whether to impose an extended sentence. Common experience teaches that the subjective pain of mental [suffering] often exceeds that of physical injury \*\*\*. To say, therefore, that physical injury is the sole criterion that courts may consider under the extended-term statute is to ignore an obvious class of injuries and to invite unreasonable results." (Emphasis added.) (102 Ill. App. 3d 414, 425, 429 N.E.2d 1255.)

Defendant does not challenge the trial court's finding that he "mentally abused [the victims] in a horrible, heinous and vicious fashion." Thus, it is sufficient that we conclude the trial court did not abuse its discretion in imposing an extended sentence upon finding that defendant inflicted mental abuse on the victims of the offenses charged.

For all of the foregoing reasons the judgment of conviction entered and the sentence imposed by the circuit court of Cook County are affirmed.

Judgment affirmed.

McNAMARA, P.J., and WHITE, J., concur.