THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. VICTOR WARE, Defendant-Appellant.

First District (1st Division)   No. 1—85—2462

Opinion filed December 27, 1988.

Michael J. Pelletier and Barbara Kamm, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Inge Fryklund, Susan J. Crane, and Patrick M. Brady, Assistant State's Attorneys, of counsel), for the People.

JUSTICE BUCKLEY delivered the opinion of the court:

Victor Ware (defendant) was indicted for the offenses of attempted murder (Ill. Rev. Stat. 1983, ch. 38, pars. 8—4, 9—1) and aggravated battery (Ill. Rev. Stat. 1983, ch. 38, par. 12—4). Following a bench trial, defendant was convicted of attempted murder and sentenced to a 15-year prison term. Defendant appeals his conviction and sentence, contending that the trial court erred in excluding relevant testimony supporting his theory of self-defense, that defendant was not proven guilty of attempted murder beyond a reasonable doubt, and that the trial court abused its discretion in imposing a 15-year prison sentence. We affirm.

Prior to defendant's trial for his involvement in a shooting inci-

dent on January 12, 1984, in which Steven Perry sustained four bullet wounds and was subsequently hospitalized in "nonsalvageable condition," defense counsel agreed that Perry's deposition could be taken in lieu of bringing a jury to the hospital to hear his testimony. In a subsequent pretrial hearing, the trial court found "good cause" to admit the video-taped deposition at trial instead of a transcript of the deposition. In ruling on objections concerning Perry's deposition testimony, the court also deleted testimony relating to Perry's involvement with the Black Gangster Disciple gang over defense counsel's objection.

At trial, the State and defendant presented conflicting versions of the events surrounding the shooting incident. The State presented the following evidence. Perry testified that at approximately 7 p.m. on January 12, 1984, Edgar Lofton telephoned him and asked him to meet Lofton at Church's Chicken. While Perry awaited Lofton's arrival at Church's, defendant, who was married to Perry's sister Kim, approached and requested that Perry accompany him to meet some girls. Perry and defendant drove in defendant's car to defendant's apartment at 2222 South State Street in Chicago. Perry did not think it was unusual to "go chase women with his brother-in-law," as he described his relationship with defendant as "real close."

Upon their arrival at the apartment building, Perry followed defendant into his fourth-floor apartment. As Perry turned to lock the door, he heard defendant say, "Aha, I got you now." Defendant then shot Perry four or five times from a distance of 15 feet. Perry thereafter opened the door and ran down the stairs of the building, while defendant continued to fire shots at him and struck him several times. Perry finally collapsed into the doorway of an apartment on the first floor.

Perry further testified that his sister Kim, having previously been hospitalized for attempting suicide because defendant was always "jumping" on her, was living with Perry and their mother at the time of these events. These circumstances notwithstanding, Perry stated that he did not provoke defendant or have any personal problems with him, and that he knew of no reason why defendant would want to harm him. Perry also acknowledged a previous conviction for pickpocketing.

Chicago police officers Thomas Chuchman and Debra Brown testified that Perry told them at the scene that defendant shot him. Chuchman also testified that defendant telephoned his mother while Chuchman was at defendant's mother's house, and that when defendant later arrived there pursuant to Chuchman's request, his left fore-

arm was wrapped up and he had bloodstains on his shirt. Chuchman then took defendant to Mercy Hospital, where the doctor told him that defendant's injury was a possible bullet wound.

Defendant refused to sign a statement prepared by Assistant State's Attorney Lori Levin after an interview Levin conducted of defendant at Mercy Hospital in the early morning hours of January 13, 1984. Nonetheless, Levin testified as to their conversation. Defendant told Levin that he met Perry at Church's at Perry's request to discuss his wife's moving out of the house. After he refused to give Perry Kim's clothes, Perry pulled out a gun and forced him to drive to defendant's apartment. Once at the apartment, Perry ran one way, they tussled, Perry ran the other way, and then defendant shot at him four times. Defendant never mentioned that Perry had a knife or that he saw any witnesses to the occurrence.

Edgar Lofton testified that he telephoned Perry at defendant's request and told Perry defendant would be at Church's. He admitted that his testimony differed from his earlier representation that he had never telephoned Perry, explaining that he changed his story after he was informed by police that they were contemplating charging him with conspiracy to commit murder.

Finally, witnesses from the Chicago police department who investigated the scene testified for the State. Officer Brown recovered live shell casings and two empty casings 25 feet from the first-floor apartment where Perry was lying and three cartridges on the stairwell between the middle and bottom stairs. The State and defendant stipulated that four live cartridges and six discharged cartridges were examined in the crime laboratory and that the discharged cartridges were fired from the same weapon. Detective Edward Schmidt discovered a trail of blood which led from the first-floor apartment up the stairwell to the fourth-floor landing. He also discovered blood on the outside of the door of defendant's apartment and blood on the carpeting in the apartment approximately 10 feet from the door.

The factual scenario presented by defense witnesses differed from that presented by the State. Defendant testified that Perry telephoned him at approximately 7 p.m. while he was at his sister Debra Ware's apartment with his other sister Kermitt and Lajuanna Newman and requested that defendant meet him at Church's to discuss defendant's wife Kim. At Church's, defendant refused Perry's request for Kim's clothes. Perry then declared that he would shoot defendant if he did not comply with his request and thereupon pulled out a gun and told defendant to drive to his apartment.

There, Perry ordered defendant into the building, locked the door

when the two entered his apartment, pointed the gun at defendant, and demanded Kim's clothing. After defendant again refused, Perry pulled back the hammer of the gun and it fired. A bullet struck defendant's left hand, and defendant lunged at Perry. The two struggled, during which time the gun discharged several times, with the gun finally falling to the floor. Perry then opened the door and ran out. Defendant picked up the gun and, not seeing Perry in the hallway, headed for the front stairs. As he headed down the hallway, he heard Newman yell, "Victor, watch out," and turned to observe Perry coming at him with a knife. Defendant fired twice, and Perry went down the back steps. Defendant then descended the front stairs to his sister's apartment on the second floor, dropping the gun along the way.

Several witnesses corroborated defendant's testimony as to specific events. Defendant's sister Kermitt testified that Perry called her apartment on January 12, 1984, and requested to speak to defendant. Steven Anderson and John Frank Harris testified that they were in the parking lot when they noticed defendant and Perry, who was carrying a gun by his side, enter the building. Newman testified that as she entered the fourth-floor hallway, she observed defendant bent over, holding his stomach, and Perry running towards defendant yielding a knife. She hollered to defendant to "watch out" and then ran back down the stairs to Debra's apartment, where she heard a few gunshots. Anderson testified that about 10 minutes later while he was on the second floor in the stairwell, Perry pushed him aside and rushed down the stairs, carrying a knife. Kermitt and Newman also testified that defendant later returned to Debra's apartment with his wrist bleeding. Newman stated that defendant told them Perry pulled a gun on him, shot him and then a struggle ensued. None of these witnesses related these events to police.

In addition, defendant called Chicago police officer Popovitz and Mary Ann Furlong, a crime lab technician with the Chicago police department, to corroborate his testimony. Popovitz testified to a conversation with Perry in the hospital 13 days after the shooting, wherein Perry recounted that he and defendant went to defendant's apartment to pick up Kim's clothes. Popovitz also wrote in his police report that defendant pulled a gun on Perry as he was "approaching" defendant's apartment. Furlong testified that defendant's type of blood was found on the living room floor of his apartment, and defendant's and Perry's types of blood were found on defendant's trousers and shoes.

Defendant's last corroborating witness, Ida Boyd, who was a

friend of Perry and of defendant, testified that Perry told her four days prior to the shooting that because he was tired of the way defendant treated his sister, he was going to persuade one of his friends to "kill him and shoot him." Boyd did not tell anyone about this conversation until she related it to defendant a year after the shooting.

A number of witnesses testified as to Perry's reputation in the community. Boyd stated that Perry was in a gang and was always in trouble. Anderson stated that Perry was "wild," "off like," and "always want[ed] to make a move on something." Kermitt stated that people's opinion of Perry was bad. On the State's rebuttal, Lofton testified that Perry was a Black Gangster Disciple.

On appeal, defendant initially contends that the trial court erred in excluding testimony relevant to his self-defense theory that Perry was the initial aggressor. Defendant first directs us to the trial court's refusal, on defendant's cross-examination of an attending physician, to admit testimony concerning a report of a psychiatric examination taken of Perry 12 days after the shooting. Defense counsel, in an offer of proof, represented that the consultation report by Dr. Johnson indicated that Perry had "a history of hostility and belligerence towards the staff and that there is an impression that some amount of hostility and belligerence appears to be the norm for Perry." Defendant also directs us to testimony elicited from Perry that he associates with members of the Black Gangster Disciples and the trial court's exclusion of this testimony because there was no indication that the crime was gang-related or evidence that Perry was a member of the gang.

■ ■ It is well established that when a theory of self-defense is raised in a battery or homicide case and defendant provides some evidence that the victim was the aggressor, evidence of the violent character of the victim may be introduced as relevant, circumstantial evidence to show that the victim was the initial aggressor. (*People v. Randle* (1986), 147 Ill. App. 3d 621, 498 N.E.2d 732; *People v. Robinson* (1987), 163 Ill. App. 3d 754, 516 N.E.2d 1292; *People v. Seals* (1987), 153 Ill. App. 3d 417, 505 N.E.2d 1107.) We first recognize that evidence of a complaining witness' aggressive and violent character or disposition may be relevant to support a theory of self-defense for two different and independent purposes: (1) to show the defendant's knowledge of the victim's violent tendencies to demonstrate the reasonableness of the defendant's state of mind in acting in self-defense, and (2) to support the defendant's assertion that the victim was the initial aggressor where there are conflicting accounts of the incident.

*People v. Lynch* (1984), 104 Ill. 2d 194, 470 N.E.2d 1018; *People v. Buchanan* (1980), 91 Ill. App. 3d 13, 414 N.E.2d 262; *People v. Fischer* (1981), 100 Ill. App. 3d 195, 426 N.E.2d 965.

"These distinct purposes serve different functions and carry different requirements as to the defendant's knowledge of the deceased's character and reputation. [Citation.] When used for the first purpose, the defendant must have known the information concerning the deceased when the act of self-defense occurred. *** A requirement that the defendant knew of the deceased's propensity for violence is unrelated to the second purpose, however. Evidence that the victim was a violent person or committed violent acts helps corroborate the defendant's testimony that the deceased was the initial aggressor; the defendant's lack of knowledge concerning the deceased's reputation for character does not affect the relevancy of evidence offered for this purpose." *People v. Buchanan* (1980), 91 Ill. App. 3d 13, 16, 414 N.E.2d 262, 264.

■ Defendant in the instant case argues that the excluded evidence should have been admitted for the second purpose—to show that Perry was the initial aggressor. While defendant need not have knowledge of the victim's aggressive behavior for the evidence to be admissible for this purpose, the evidence must nevertheless be appropriate. (See *People v. Lynch* (1984), 104 Ill. 2d 194, 201-03, 470 N.E.2d 1018, 1020-21.) A basic precept for determining whether proof is appropriate to admit into evidence is its relevancy.

■ Evidence is relevant which tends to prove or disprove a disputed fact or tends to make a point in issue more or less probable. (*People v. Jones* (1987), 161 Ill. App. 3d 688, 515 N.E.2d 166; *People v. Hunter* (1984), 124 Ill. App. 3d 516, 464 N.E.2d 659; *People v. Bouska* (1983), 118 Ill. App. 3d 595, 455 N.E.2d 257.) To be probable, it must be tested in the light of logic, experience and accepted assumptions as to human behavior. (*Marut v. Costello* (1966), 34 Ill. 2d 125, 128, 214 N.E.2d 768, 769.) The initial determination of relevancy is within the sound discretion of the court and will not be reversed absent an abuse of that discretion. *People v. Jones* (1987), 161 Ill. App. 3d 688, 696, 515 N.E.2d 166, 171; *People v. Hunter* (1984), 124 Ill. App. 3d 516, 533, 464 N.E.2d 659, 674.

■ We find that the trial court did not abuse its discretion in finding the evidence in issue irrelevant. The psychiatric report here was taken 12 days after the shooting incident while Perry was hospitalized and nursing critical wounds. Logic, experience, and accepted assumptions as to human behavior suggest that any finding of beli-

gerent behavior on the part of Perry were attributable to the shooting and the extensive injuries he sustained as a result of the shooting. This report would not make it more probable that Perry was the aggressor on January 12, 1984. Likewise, the testimony that Perry associated with gang members does not make it more probable that he performed specific acts of violence on January 12, 1984. Perry did not state that he was a gang member, nor was there any evidence showing he performed any acts of aggression in his association with gang members.

In *People v. Lynch* (1984), 104 Ill. 2d 194, 470 N.E.2d 1018, the supreme court found that the commission of a battery is *prima facie* probative of aggressive violent tendencies and that convictions for crimes of violence are reasonably reliable evidence of a violent character. (104 Ill. 2d at 203, 470 N.E.2d at 1021.) Unlike *Lynch* and the other cases defendant cites where specific incidents of aggression were in issue, the testimony here is too general and indefinite to be viewed as reliable evidence and *prima facie* probative of aggressive violent tendencies.

Defendant next maintains that the State failed to meet its burden of proving beyond a reasonable doubt that defendant did not act in self-defense. To support his contention, defendant argues that the State's case rested almost totally on a witness whose testimony was improbable, conflicting and contradicted and that defendant's testimony was corroborated and more believable.

■ In reviewing the testimony presented by the State and the defense here, we must bear in mind that the function of a trial court in nonjury cases is to determine the weight and credibility of the testimony and to resolve conflicts (*People v. Jackson* (1978), 59 Ill. App. 3d 1004, 1007, 376 N.E.2d 685, 687), and its determination should not be disturbed unless manifestly erroneous (*People v. Deming* (1980), 87 Ill. App. 3d 953, 959, 409 N.E.2d 352, 357). After a careful review of the evidence in this cause, we do not find that the trial court's determination as to the credibility of the witnesses was manifestly erroneous.

■ First, while it is established that a conviction based upon testimony that is improbable, unconvincing and contrary to human experience requires a reversal (*People v. Garner* (1974), 19 Ill. App. 3d 728, 312 N.E.2d 678; *People v. Smiley* (1975), 32 Ill. App. 3d 948, 949, 337 N.E.2d 290, 291), we do not find that Perry's testimony reached that level. The portions of Perry's testimony that defendant refers us to—that Perry forgot his meeting with Lofton when he left Church's with defendant, that Perry went looking for girls with his

sister's husband, and that Perry harbored no ill will toward defendant despite defendant's treatment of his sister—do not demonstrate that his testimony regarding the shooting incident is highly incredible.

■ Secondly, the fact that the State's case rested substantially on Perry's testimony is not determinative. It is established that the testimony of one credible witness, if positive, is sufficient to convict even where testimony is contradicted by the accused (*People v. Tribett* (1981), 98 Ill. App. 3d 663, 681, 424 N.E.2d 688, 701), and conflicting testimony and corroboration of a defendant's testimony do not require a reversal where the prosecution presents sufficient evidence to convict (*People v. Dixon* (1976), 39 Ill. App. 3d 132, 136, 350 N.E.2d 193, 196).

Thirdly, there is sufficient evidence in the record to support the court's finding that Perry's testimony is believable, and the contrary evidence presented by the defense is not significant enough to hold that the court's finding was manifestly erroneous. The State presented some evidence to corroborate Perry's testimony. Police officers who responded to the scene immediately after the occurrence testified that Perry stated, while he was lying injured on the floor, that defendant shot him. An assistant State's Attorney testified that following the shooting defendant stated that after he tussled with Perry, defendant shot at him as Perry "ran in another direction." Live shell casings and empty casings were also found at the scene 25 feet from the first-floor apartment where Perry was found, substantiating Perry's testimony that defendant continued to shoot at him as he was running down the stairs.

Furthermore, the testimony of most of the defense witnesses was questionable. Although Newman testified she observed what happened in the fourth-floor hallway, she knew defendant, and was a friend of his sister, she never called the police. Likewise, Anderson, who testified he observed Perry running down the stairs with a knife, never related the incident to police at the scene. Boyd, a friend of both defendant and Perry, never told defendant about Perry's threat to kill him until more than a year after the shooting. Defendant also did not relate significant facts to the police shortly after the shooting, including the fact that Anderson and Newman observed Perry with the gun and the fact that Perry had a knife. Defendant's, Newman's and Anderson's testimony that Perry had a knife appears to be an obvious fabrication, as the knife was not found on Perry or at the scene when police arrived shortly after the shooting, and it is incredulous to believe that Perry, after being shot and fleeing the apartment knowing defendant had the gun, would then return in the hallway with a knife.

The only nonquestionable evidence supporting defendant's story is the testimony from a police officer that Perry told him two weeks after the shooting that he went to defendant's apartment to retrieve his sister's clothing; physical evidence that defendant's type of blood was found 10 feet from the door; that defendant had a bullet wound in his left wrist; and that defendant's and Perry's blood types were found on defendant's clothing. We do not find this evidence sufficient to hold that the trial court's finding as to the credibility of the witnesses was manifestly erroneous.

■ Defendant's final contention is that the trial court abused its discretion in sentencing defendant to a 15-year prison term by failing to consider mitigating aspects about the circumstances of the offense, failing to adequately consider defendant's rehabilitative potential, and improperly considering the hostility between defendant and his wife in aggravation.

The record reveals that the trial court followed the statutory framework in imposing defendant's sentence. It does not indicate, as defendant suggests, that the court was improperly preoccupied with the victim's injury in aggravation and did not consider defendant's mitigating attributes. It is clear that a court may consider the degree of harm as a aggravating factor in determining the exact length of a particular sentence. (*People v. Saldivar* (1986), 113 Ill. 2d 256, 269, 497 N.E.2d 1138, 1143.) The court here noted the degree of harm to the victim, but also noted a number of other aggravating factors, including defendant's lack of remorse, his danger to society, and his desire to kill the victim, as evidence by his plotting to kill the victim, chasing him, and firing numerous shots at him.

Moreover, the court commented on defendant's age of 26, his good education, and his lack of a criminal record. The court stated that it weighed these mitigating factors against the possibility of giving defendant an extended term. The sentence imposed of 15 years for an offense with a statutory sentence range of 6 to 30 years also suggests that the court weighed these mitigating factors.

Finally, we do not find that the court improperly considered the hostility between defendant and his wife in aggravation. The court's comments regarding defendant's hostile relationship with his wife were made in response to defendant's negative statements about his wife and during the court's remarks concerning defendant's attitude and lack of remorse. There is no indication that the court considered this as an aggravating factor. Furthermore, even if the court did consider defendant's hostility with his wife as a factor, a sentencing court may inquire into a defendant's moral character, his social environ-

ments, and the stimuli which motivate his conduct. (*People v. Adkins* (1968), 41 Ill. 2d 297, 242 N.E.2d 258.) It was the State's position at trial that the shooting was an act of revenge towards defendant's estranged wife aimed at the victim. Since defendant's comments at sentencing indicated that hostile feelings towards his wife still existed, the trial court could properly consider this fact in sentencing.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

CAMPBELL, P.J., and O'CONNOR, J., concur.